Charles E. BEERHEIDE, Sheldon
Perlman, and Allen Isaac
Fistell, Plaintiffs,

v.

John W. SUTHERS, Executive Director, Colorado Department of Corrections; Gerald M. Gasko, Deputy Director, Colorado Department of Corrections; Dona Zavislan, Food Service Administrator, Colorado Department of Corrections; Lee Hendrix, Volunteer Service Coordinator, Colorado Department of Corrections, Defendants.

Civil Action Nos. 95–B–2325,
95–B–2326, 95–B–2481.

United States District Court,
D. Colorado.

Jan. 31, 2000.

---

Scot Melvin Peterson, Collins & Pringle, Denver, CO, Scott Dennis Helker, Helker Law Office, Golden, CO, for Charles E. Beerheide, plaintiff.

Paul S. Sanzo, Attorney General's Office Tort Litigation Section, Denver, CO, Thomas S. Parchman, Attorney General's Office Human Resources Section, Denver, CO, for Colorado Dept. of Corrections, defendant.

Scot Melvin Peterson, Dwight L. Pringle, Collins & Pringle, Denver, CO, for James J. Higgins, amicus.

## MODIFIED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

BABCOCK, District Judge.

In these consolidated cases brought pursuant to 42 U.S.C. § 1983, Plaintiffs, Charles E. Beerheide, Sheldon Perlman, and Allen Isaac Fistell (collectively, Plaintiffs), inmates in the custody of the Colorado Department of Corrections (DOC), claim that the Defendants, all employees of the Colorado Department of Corrections (DOC), are violating their constitutional rights to: 1) free exercise of their religion as guaranteed by the First Amendment to the United States Constitution by failing to provide kosher meals to them; and 2) due process of law under the Fifth and Fourteenth Amendments by failing to comply with DOC's administrative regulations and state statutes. Plaintiffs seek only declaratory and injunctive relief. After trial to the Court, I now enter the following findings of fact, conclusions of law, and order of judgment.

## I.

### Procedural Background

On December 16, 1996, Plaintiffs filed a motion for preliminary injunction on their claims for provision of a kosher diet based on Defendants' alleged violations of the: 1) Free Exercise Clause of the First Amendment to the United States Constitution; and 2) Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* I referred the motion to the magistrate judge for recommendation pursuant to § 28 U.S.C. 636(b)(1)(B). After an evidentiary hearing, the magistrate judge issued a recommendation to grant a preliminary injunction "in favor of Plaintiffs and against Defendant on the issue of a Kosher diet; and ... deny[ing][it] in all other respects." Magistrate Judge Recommendation, p. 16.

Pursuant to Defendants' written objections to the recommendation. I held a hearing on the objections and took the matter under advisement pending the United States Supreme Court's decision on the constitutionality of the RFRA. *See Flores v. City of Boerne,* 73 F.3d 1352 (5th Cir.), *cert. granted,* 519 U.S. 926, 117 S.Ct. 293, 136 L.Ed.2d 212 (1996). In *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Court declared the RFRA unconstitutional.

Pursuant to § 28 U.S.C. 636(b)(1), I conducted a *de novo* review of the facts, the law, and the legal analysis in the recommendation, and Defendants' objections to it. *See Koetting v. Thompson,* 995 F.2d 37 (5th Cir.1993). However, because the recommendation was based on application of the RFRA, in light of *Boerne,* I reviewed this case under pre-RFRA standards including case law properly not considered by the magistrate judge in making his recommendation. I concluded that Plaintiffs were entitled to preliminary injunctive relief based on their First Amendment Free Exercise claim. Therefore, I did not address their Due Process claim. On March 16, 1999, I entered a preliminary

injunction, directing the DOC to provide kosher food to the Plaintiffs in accordance with orthodox Jewish law. *Beerheide v. Zavaras,* 997 F.Supp. 1405, 1413 (D.Colo. 1998) (*Beerheide I* ).

Pursuant to the parties' stipulation placed on the record during a September 24, 1999 hearing, the findings of fact and conclusions of law contained in *Beerheide I,* are adopted for purposes of the trial of the following remaining issues in this case: 1) Plaintiff Beerheide's sincerity of belief in Judaism; 2) Plaintiff Fistell's sincerity of belief in Judaism; and 3) the constitutionality of Plaintiffs' proposed kosher diet cost-sharing program.

## II.

### Findings of Fact

At trial, the evidence established the following facts. Plaintiffs are inmates at Fremont Correctional Facility, one of twenty-one adult correctional facilities in the State of Colorado Department of Corrections housing approximately 10,000 to 12,000 inmates. Mr. Beerheide, whose father is Jewish, was not raised Jewish and did not practice Judaism before he was incarcerated. After Mr. Beerheide was sent to prison, he became interested in Judaism, studied Judaism, and has followed the tenets of orthodox Judaism since 1994. Mr. Fistell, born and raised in the Jewish faith, has not always been an observant Jew. At some time after his commitment to the DOC, Mr. Fistell resumed practicing orthodox Judaism. Mr. Perlman, born in 1933, was raised in an orthodox Jewish family. Until approximately 10 years before he was incarcerated in 1989, Mr. Perlman kept a kosher home. After his incarceration, Mr. Perlman resumed his practice of orthodox Judaism. Plaintiffs testified that they wish to observe the practices of orthodox Judaism including eating only kosher food.

Rabbi Yisroel Engle, qualified by the Court as an expert witness on Jewish law and Jewish dietary law, testified that "keeping kosher" is a central tenet of orthodox Judaism. Rabbi Steven Foster, an expert witness on Jewish law and Jewish conversion, agreed. As outlined in *Beerheide I,* "keeping kosher" includes adherence to specific rules concerning which foods may be eaten and which are forbidden. Foods that may be eaten include all non-animal products such as fruits and vegetables, meat from animals without cloven hooves including cows and sheep, and fish which have fins and scales. "Kosher" also dictates specific methods by which allowable foods are prepared for consumption. For example, kosher food is no longer "kosher" if it is prepared in containers which have held non-kosher food. To keep kosher foods untainted, containers, pots and pans, utensils, and all other implements used in their preparation must not come into contact with any item that is or has had contact with nonkosher food. Also, to keep kosher food "kosher," it must be served on plates and bowls and eaten with utensils which have not had nonkosher contact. *See Beerheide I,* 997 F.Supp. at 1408–09.

It is undisputed that after the issuance of the preliminary injunction in this case, the DOC Food Services department began serving Plaintiffs a kosher diet. To assist in the implementation of the program, DOC set up at a modified kosher kitchen within the regular prison kitchen. Mr. Beerheide began working in the kitchen in a special locked and caged area set aside for the preparation of the kosher food trays for himself, and his co-Plaintiffs. In addition, DOC has provided a microwave oven, preparation table, two cutting boards, two non-disposable knives, one pot, one pan, plastic tubs, plastic storage drawers, plastic wear and trays, butcher paper, and aluminum foil for exclusive use in the preparation of the kosher meals. Beerheide Testimony, October 12, 1999. The parties agree that the cost of providing a kosher diet to Plaintiffs is higher than the cost of the general fare.

The DOC agrees to provide nutritionally adequate kosher meals to Plaintiffs if they: 1) are sincere in their religious beliefs to

maintain a kosher diet; and 2) are willing to pay a co-pay of 25% of the cost of the diet up to a maximum of $90 per month.

## III.

### A. Claim one for violation of the Free Exercise Clause of the First Amendment

#### 1. Plaintiffs' entitlement to a kosher diet

 The First Amendment to the United States Constitution provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." United States Constitution, Article I. The initial inquiry in a free exercise claim is whether a plaintiff's beliefs are religious in nature, and whether those religious beliefs are sincerely held. *United States v. Seeger*, 380 U.S. 163, 183–84, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965); *Snyder v. Murray City Corp.*, 124 F.3d 1349, 1352 (10th Cir.1997), *vacated in part on other grounds*, 159 F.3d 1227 (10th Cir. 1998). Only beliefs which are religious in nature are protected by the Free Exercise clause. *Snyder, id.* Whether religious beliefs are sincerely held is a question of fact. *Mosier v. Maynard*, 937 F.2d 1521, 1526 (10th Cir.1991).

Defense witnesses Rabbi Heisler and Rabbi Foster and Plaintiffs' witness Rabbi Engle all testified that following kosher dietary laws is a tenet of Judaism. Thus, there is no dispute that the keeping kosher is a religious belief. The salient issue is whether the Plaintiffs' religious beliefs are sincere. Defendants do not dispute that Mr. Perlman's religious beliefs are sincere. They contend, however, that Mr. Beerheide and Mr. Fistell are not sincere in their religious beliefs. I disagree.

#### a. Charles Beerheide

 It is undisputed that Mr. Beerheide, born of a Jewish father and a non-Jewish mother, was not raised in the Jewish faith. After entering prison, however, he began studying Judaism. It is also undisputed that over the last five to six years, Mr. Beerheide has studied Judaism with Rabbi Winkler and Rabbi Engle. Mr. Beerheide testified that during his incarceration, he: 1) continues to learn Hebrew; 2) studies the Talmudic or written law of Judaism; 3) prays on a regular basis; 4) observes the Jewish holy days; and 5) desires to follow a kosher diet. Since March 16, 1998, Mr. Beerheide has eaten a kosher diet, as provided by the DOC pursuant to the Court's preliminary injunction. Moreover, after the DOC began serving a kosher diet to these Plaintiffs, Mr. Beerheide gave up his job in the prison furniture shop to work in the kitchen preparing the kosher diets for himself, Mr. Fistell and Mr. Perlman at a significantly lower rate of pay.

In addition, other witnesses testified concerning the sincerity of Mr. Beerheide's faith. Manual Weiss, a Jewish volunteer and rabbi's helper, testified that he regularly visits DOC inmates including Mr. Beerheide, whom he has known at least eight years. Based on these visits, Mr. Weiss testified that he believes Mr. Beerheide is sincere in his beliefs, including his desire to keep kosher. Rabbi Engle, a volunteer rabbi at the DOC who has visited with Mr. Beerheide, testified that he believes Mr. Beerheide is serious about practicing Judaism.

Defendants state that Mr. Beerheide, born to a non-Jewish mother and not yet validly converted, is a non-Jew. Therefore, according to Defendants, for Mr. Beerheide it is not an essential religious tenet to keep kosher. Defendants' Closing Argument, p. 16. I am not persuaded.

Based on the trial testimony of Rabbis Engle, Heisler, and Stephen Foster, it is clear that there is no single rabbinical standard for determining if a person is Jewish. For example, Rabbis Heisler and Engle, both orthodox Jews, testified that to be Jewish under orthodox standards, one must either be born to a Jewish mother or have undergone a valid conversion. Rabbi Foster, a practitioner of reform Judaism, set forth a less stringent standard

for determining if one is Jewish. He stated that he would recognize someone as Jewish if he were born to a Jewish father if the father raised the child in the Jewish tradition. He also recognized proper conversions.

It is undisputed that although Mr. Beerheide has studied the Jewish faith extensively, as a result of his incarceration, he is unable to undergo all requirements of a proper conversion including: 1) the ritual bath, mikvah; 2) ritual circumcision; and 3) the Bas Din, an evaluation by three Jewish men, often rabbis, who observe the Sabbath. Thus, Defendants view Mr. Beerheide as a non-Jew for whom keeping kosher is not an essential religious tenet. Trial testimony established, however, that keeping kosher is not merely a religious tenet for persons recognized as Jewish by the rabbis.

Rabbi Engle testified that the basic laws of Kashrud, kosher, are the same for all Jews, orthodox or not. Trial testimony, October 12, 1999. Rabbi Engle testified further that a person in the process of conversion, such as Mr. Beerheide, is expected to follow a kosher lifestyle prior to conversion. *Id.* Rabbi Foster, a reform rabbi, agreed that persons looking towards conversion at some time in the future would participate in keeping kosher to the best of their ability. Trial testimony, October 12, 1999.

After consideration of the rabbinical expert testimony, I am persuaded that it is in keeping with Jewish law and tradition for a non-Jew in converting to Judaism to keep kosher. Thus, it is permissible for Mr. Beerheide to seek a kosher diet based on religious grounds if he is sincere in his beliefs. As to his sincerity, there was no evidence presented to rebut the testimony of Mr. Beerheide, Mr. Weiss, and Rabbi Engle that Mr. Beerheide is sincere in his religious beliefs and his desire to practice Judaism, including keeping kosher.

### b. Alan Fistell

■ Mr. Fistell testified that he was born and raised a Jew but before his incarceration was not an observant Jew. After he was arrested, but before he was transferred to prison, Mr. Fistell talked with Rabbi Engle and continued these visits after he arrived at Buena Vista Correctional Facility. At Mr. Fistell's request, he was transferred to Fremont Correctional Facility which provides him the opportunity to meet with the rabbis and attend Jewish services and study meetings. In addition, Mr. Fistell testified that he works as the unpaid librarian of Jewish books at Fremont. At all times, he wears a Jewish head covering, a yarmulka. Mr. Fistell presented the testimony of Mr. Weiss, a volunteer rabbi's helper in the DOC who has known Mr. Fistell for at least 8 or 9 years, that Mr. Fistell is very sincere in his Jewish beliefs.

Defendants recognize that despite Mr. Fistell's failure to keep kosher for a long time before being sent to prison and for some time after, it was possible for him to become sincere in his religious beliefs while in prison. Defendants' Closing Argument, p. 15. Indeed, Rabbi Engle testified that a non-observant Jew who desires to become observant again is encouraged to return to Jewish law. Trial testimony, October 12, 1999. However, Defendants point to Mr. Fistell's testimony that he is unwilling to make a co-payment to keep kosher as evidence of his religious insincerity. But this begs the question here and cannot provide a basis for determining Mr. Fistell's religious sincerity. After consideration of the unrebutted testimony of Mr. Fistell and Mr. Weiss, I find that Mr. Fistell is sincere in his practice of Judaism including his request to eat a kosher diet.

Having determined that Mr. Beerheide and Mr. Fistell are sincere in their religious beliefs, and in light of Defendants' concession that Mr. Perlman is sincere in his religious beliefs, I find and conclude that Plaintiffs are entitled to a kosher diet while committed to the DOC.

### 2. Defendants' Proposed Co-pay Kosher Diet Program

Having determined that Plaintiffs are sincere in their desire to keep kosher, I

turn to the issue whether, pursuant to the Free Exercise Clause of the First Amendment, the DOC can require Plaintiffs to make a cost-based co-payment to participate in the kosher diet provided by the DOC.

■ In the Tenth Circuit, prisoners have a constitutional right to a diet conforming to sincerely held religious beliefs, unless denying the diet is "reasonably related to legitimate penological interests." *Beerheide I*, 997 F.Supp. at 1411 *citing LaFevers v. Saffle*, 936 F.2d 1117, 1119 (10th Cir.1991). The standard for determining the constitutionality of prison regulations or practices that infringe inmates' religious practices was established by the Supreme Court in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The Tenth Circuit Court of Appeals has observed that "[t]his standard gives corrections officials the necessary leeway to effectively confront the intractable difficulties of administering prison systems while, at the same time, it keeps the intrusion of the judiciary into such matters at a minimum." *Clifton v. Craig*, 924 F.2d 182, 184 (10th Cir.1991) *quoting O'Lone v. Shabazz*, 482 U.S. 342, 349–50, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

■ In *Beerheide I*, I applied the standards set forth in *Turner* to determine, preliminarily, that Plaintiffs are entitled to a kosher diet provided by the DOC. *See Beerheide I* 997 F.Supp. at 1413 *citing Turner*, 482 U.S. at 89–90, 107 S.Ct. 2254. I employ the same analysis in assessing the constitutionality of the proposed co-pay program:

1. whether the regulation or action has a logical connection to the legitimate government interests invoked to justify it;

2. whether there are alternative means of exercising the rights that remain open to the inmates;

3. the impact the accommodation of the asserted constitutional rights will have on other inmates, guards and prison resources; and

4. the presence or absence of ready alternatives that fully accommodate the prisoner's rights at *de minimis* costs to valid penological interests.

*Turner*, 482 U.S. at 89–90, 107 S.Ct. 2254. The existence of "obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* at 90, 107 S.Ct. 2254.

### a. DOC's Proposed Co-pay Program

■ The DOC proffers two governmental concerns related to legitimate correctional goals to justify its co-pay proposals: 1) budgetary considerations; and 2) prevention of inmate abuse of religious diets. As I stated in *Beerheide I*, these concerns are legitimate in the abstract. As discussed below, however, the nexus between DOC's proposed co-pay program and the correctional goals is too tenuous to withstand scrutiny.

Defendants propose a program by which Plaintiffs would be required to make a co-payment of no more than 25% of the additional cost of the kosher meals. Defendants proffer evidence that presently, the cost of a kosher diet is between $2.50 to $4.50 per meal. Zavislan Testimony, October 13, 1999. In an apparent approximation of the cost, Defendants would require the co-pay of 25% be applied to the additional dietary cost of approximately $360.00 per month per inmate. Thus, under the plan, each Plaintiff would pay $90.00 a month to obtain the kosher diet. If a Plaintiff does not have the means to pay $90.00 per month, he would incur a debit to his inmate account, against which future deposits would be credited. According to Brian Burnett, DOC deputy director of administration, if an inmate's account has a negative balance when he is released from prison, the account could be turned over to DOC's central collections or the inmate's parole officer could be informed to collect the negative balance. *See* Burnett Testimony, October 13, 1999.

3. Application of Turner factors

a. **Valid connection between prison action and governmental interests**

The right to free exercise of religious beliefs may "be restricted in order to achieve legitimate correctional goals," *Bell v. Wolfish,* 441 U.S. 520, 546–47, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), including institutional security and operating a simplified food service. *Ashelman v. Wawrzaszek,* 111 F.3d 674, 677 (9th Cir.1997). Thus, the reasonableness inquiry in this case must address whether there exists a rational relationship between the proposed co-pay program and a legitimate government interest advanced as its justification. *See Makin v. Colorado Dept. of Corrections,* 183 F.3d 1205, 1209 (10th Cir.1999) (inmate in punitive segregation entitled to meal accommodations during Muslim holiday of Ramadan).

Defendants state that budgetary concerns and other prisoners' response to the provision of a kosher diet justify the proposed co-pay program. These concerns are legitimate interests of the DOC. Moreover, there is no doubt that if Plaintiffs paid a portion of the additional costs of the kosher program, it would reduce the impact on DOC's budget. Further, Defendants present undisputed evidence that when a co-pay program was instituted for medical appointments, the number of medical visits declined. As to medical visits, it can be assumed that the number of unwarranted medical appointments declined. This circumstantial evidence warrants an inference that a co-pay dietary program would deter abuse of kosher diets. The first factor weighs in favor of the Defendants.

b. **Alternative means to exercise the right to eat a kosher diet**

There are alternative methods by which Plaintiffs could obtain kosher meals. First, Plaintiffs could purchase Kosher meals available in the prison canteen. However, the evidence established that the Plaintiffs would be unable financially to purchase kosher meals due to their very limited income. Moreover, Ms. Zavislan testified that to provide a nutritionally balanced diet, the kosher TV dinners would have to be supplemented with fruits, vegetables, and bread products. To ensure that these foods are kosher, they would have to be prepared and served in a kosher manner. This would result in similar food preparation issues now before me. This alternative is not feasible. Also, during special Jewish holidays such as Passover, kosher food is brought in from the community for the Jewish inmates. However, daily provision of kosher food by the community is not feasible. Under these circumstances, I find and conclude that Plaintiffs do not have a viable alternative to observing the essential tenet of Judaism of eating a kosher diet. Hence, this factor weighs in favor of Plaintiffs.

c. **the impact of the co-pay program on other inmates, guards and prison resources**

i. **cost considerations**

The parties agree that the cost of providing kosher meals is greater than the cost of the non-kosher diet served to the general population. The evidence is in conflict, however, as to the actual cost of the kosher meals. In a 1996 memorandum, Ms. Zavislan stated that the average cost of serving kosher meals was $4.50 per meal in contrast to the $0.88 cost of a non-kosher meal. Exhibit 13. In 1997, however, Ms. Zavislan submitted an affidavit in a companion case in this District, *Green v. Zavaras,* 95–S–2973, in which she averred that "[w]hereas the per meal cost of preparation of DOC food services meals is approximately $0.914 per meal, the cost of kosher preparation is estimated to be approximately **$2.50** per meal." Exhibit 29 (emphasis added). At trial, Ms. Zavislan again stated that the kosher food cost is $4.50 per meal and the non-kosher meals cost is approximately $0.90 per meal. Zavislan Testimony, October 13, 1999.

Further testimony revealed that DOC's cost estimate is fluid at best and appears

unreliable. For example, Ms. Zavislan's $4.50 per meal estimate includes the cost of kosher food products, disposable products, $0.25 per meal labor costs, and replacement costs of capital equipment and smallware items such as cutting boards, utensils, and pots and pans. Exhibit 13. However, like costs, including labor costs, are not included in the $0.90 cost per meal for the general population. Zavislan Testimony, October 13, 1999. *See* Exhibit B.

Furthermore, DOC's cost projections appear unreliable based on an examination of their cost reports. *See* Exhibit V. Major Thomas Mallory, the DOC officer in charge of Food Services at Fremont, testified that a portion of the increased costs associated with the kosher diet is attributable to specially purchased fresh fruits and vegetables, bread and cereal products, and paper products. Mallory Testimony, October 14, 1999. For example, the Food Services department purchases case lots of fresh vegetables such as lettuce and broccoli, the entire cost of which is attributed to the calculation of kosher diet costs. However, because it is not feasible for the three Plaintiffs to consume in a short period of time the large amounts contained in a case, significant waste results. Logically, the amount of waste as well as the cost of the kosher meals could be reduced by serving the excess vegetables to the general population.

There was further testimony, however, that at times, kosher items purchased for use in preparing kosher meals for Plaintiffs become contaminated and, thus, are no longer kosher. The items are then used to prepare meals for the general population. Also, there was testimony that a large number of individual cereal packages are ordered, in part because of warehouse theft. However, there is no evidence that the cost of these items is apportioned in the Food Services budget between the general population budget and the kosher diet budget. Under these circumstances, I find and conclude that DOC's cost estimates are unreliable and cannot serve as a valid basis for an assessment of the cost of the kosher diets.

Moreover, I have serious concerns that if Plaintiffs do not have sufficient funds to pay the 25% co-pay, their inmate accounts would maintain a negative balance to be turned over to DOC collections upon the inmate's discharge from prison. A major goal of parole is rehabilitation. *See Griffin v. Wisconsin,* 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); *Latta v. Fitzharris,* 521 F.2d 246, 249 (9th Cir.1975) ("The overriding goal of the parole system is to give the parolee a chance to further and to demonstrate his rehabilitation while serving a part of his sentence outside the prison walls."). To begin parole with a financial debt to DOC runs counter to this laudatory goal. Moreover, it sets the questionable precedent of encouraging the inmate to spend money he does not have. I find and conclude that Defendants' evidence concerning the cost of providing kosher diets is unreliable and speculative. Therefore, cost considerations cannot form the basis for the co-pay program proposed by the DOC.

### ii. program abuse

Defendants seek implementation of the co-pay program to prevent abuse of the kosher diet program by those inmates who are not sincere in their religious beliefs. If an inmate must pay for kosher meals, there may well be fewer requests from inmates who want the kosher diet simply because it breaks routine or seems more desirable than the general fare. However, the DOC has in place an effective method by which sincerity of an inmate's religious beliefs may be tested.

Ms. Zavislan testified that pursuant to DOC Administrative Regulation # 1550–6, effective 02/15/97, titled "Religious Diets," an inmate seeking a religious diet must adhere to the following procedure:

B. *Request for religious diet:*

1. Offenders desiring a religious diet must submit a diet request utilizing D.C. Form 1550–6A, Request for Religious Diet, Attachment A. The request must be complete and outline in detail the associated religious dietary laws to in-

clude written documentation. In lieu of such documentation, an authoritative resource or point of contact shall be noted in the request.

2. The Request for Religious Diet will be submitted by the offender to the facility Programs Manager or designee who will forward the request to the Regional Volunteer Coordinator for verification of religious affiliation and dietary recommendation . . . .

D. *Review and Removal from a Religious Diet:*

1. The following should be brought to the attention of the Administrative Head who will determine the appropriate course of action (which may result in cancellation):

 a. An offender is observed violating religious dietary requirements.

 b. An offender is observed providing all or portions of their specially prepared meal to other offenders.

 c. An offender is observed eating both their specially prepared meal and the general diet meal offered to the general population.

 d. It is determined that an offender no longer practices the associated religion.

2. The administrative Head must notify the facility Food Service Supervisor in writing when a religious diet has been cancelled.

3. Written documentation shall be maintained regarding non-compliance to support diet cancellations.

*See* Exhibit 4.

During the trial, I took judicial notice of the March 15, 1999 revision of AR 1550–6, containing the same provisions listed above. Ms. Zavislan testified further that an inmate is allowed to changed religious affiliation only one time per year. *See* AR # 800–01(IV)(E)(1). Furthermore, the effectiveness of DOC's current method of testing an inmate's religious sincerity is demonstrated by the fact that relatively few inmates, fourteen, have sought to keep kosher since the preliminary injunction was issued in this case.

DOC points to the inmate medical co-pay program implemented pursuant to § 17–1–113, C.R.S. as analogous support for its proposed kosher diet co-pay program. I am not persuaded. The State of Colorado's original medical co-payment statute, enacted in 1987, required all inmates in the custody of the Colorado Department of Corrections to be assessed a $3.00 co-payment charge each time they were seen by a physician, dentist or optometrist. *See id.* The same year, Colorado Department of Corrections inmates filed suit challenging the statute on the grounds that the co-payment charge was so large in comparison to inmate income that it constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. *Collins v. Romer,* 962 F.2d 1508 (10th Cir.1992). Further, plaintiffs asserted that the statute forced the plaintiffs to choose between basic medical care or basic hygiene necessities, since few inmates could afford both. *See id.*

In 1989, while *Collins* was pending, the Colorado legislature substantially amended the medical co-payment statute, effective July 1, 1989, to eliminate most of the instances in which inmates are charged a co-payment. *Id.* at 1511. Inmates are now assessed a co-payment charge only they see a physician without a referral from a nurse or a physician's assistant. Thus, if an inmate is unwilling or unable to pay the co-pay, the inmate is not denied medical care but only the health care provider of choice.

In contrast, under the proposed kosher food co-pay program, if Plaintiffs are unable or unwilling to make the co-payment, there is no feasible alternative which would allow them to keep kosher. *See* Section III A(3)(b). Thus, Colorado's statutory medical co-pay program is not analogous to the kosher diet co-pay program. I find and conclude this third factor weighs heavily in Plaintiffs' favor.

### 4. availability of alternative means to accommodate rights at minimal cost

The Supreme Court characterizes this factor as a method to assess whether the prison policy is an exaggerated response to a legitimate prison concern. *Turner v. Safley*, 482 U.S. at 90, 107 S.Ct. 2254. This is not, however, a "least restrictive alternative" test.

> Prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. But if an inmate can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to penological interests, a court may consider that as evidence that the regulation does satisfy the reasonable relationship standard.

*Id.* at 90–91, 107 S.Ct. 2254.

I have recognized that in the abstract, the impact on DOC Food Service's budget is a valid concern. However, DOC's own, albeit speculative, estimated cost of kosher food for Plaintiffs is $13,000 per year, or 0.158 percent of Food Service's annual budget of $8.25 million. I conclude that providing Plaintiffs with kosher meals has a *de minimis* effect on DOC's Food Service budget. This factor weighs in favor of Plaintiffs' position also.

In sum, I find and conclude that the DOC's proposed kosher diet co-pay program is not rationally related to the legitimate penalogical concerns of cost and abuse. Therefore, DOC's proposed co-pay program is an unnecessary burden on Plaintiffs' free exercise of their religion in violation of the First Amendment to the United States Constitution. Further, under the *Turner* factors, Plaintiffs are entitled to a kosher diet provided by the DOC. However, the DOC's proposed co-pay program would violate Plaintiffs' First Amendment right to free exercise of their religion. Accordingly, DOC must provide Plaintiffs a kosher diet without requiring co-payment. Beyond this, the details and method of providing Plaintiffs with a kosher diet should be left to the sound discretion of DOC officials.

### B. Claim two for failure to provide due process of law under the Fourteenth Amendment

Plaintiffs claim that Defendants violated their rights to due process of law provided by the Fourteenth Amendment to the United States Constitution by failing to comply with DOC's administrative regulations and state statutes concerning the provision of a religious diet. However, the relief requested in claim two is identical to the declaratory and injunctive relief the Plaintiffs are entitled to based on claim one. Therefore, I do not address claim two.

Accordingly, it is ORDERED that:

1. judgment shall enter for Plaintiffs and against Defendants on claim one for violation of the Free Exercise Clause of the First Amendment to the United States Constitution;

2. claim two for violation of the Fourteenth Amendment is DISMISSED as moot;

3. it is hereby DECLARED, ADJUDGED, and DECREED that Defendants are in violation of the Free Exercise Clause of the First Amendment to the United States Constitution by failing to provide Plaintiffs with a kosher diet;

4. a permanent injunction SHALL ENTER requiring Defendants, or their agents, to PROVIDE Plaintiffs with a diet that complies with the kosher dietary requirements of Orthodox Judaism, at no cost to Plaintiffs;

5. upon submission of a bill of costs and documentation within 10 days from the entry of judgment, Plaintiffs are awarded their costs, including attorney fees; AND

6. the Clerk of the Court SHALL ENTER final judgment in this matter consistent with this Order.