OWEN, District Judge,
concurring.
I am one with the majority holding that a prison inmate with sincerely-held religious beliefs should, under normal circumstances, receive meals that conform to those beliefs. Here, the three plaintiff inmates have satisfied the prison authorities of the sincerity of their beliefs and in *1193 their facility are receiving such meals. What compels this concurring opinion is the majority’s giving minimal credit to the Colorado Department of Corrections’ (DOC) perception of the problems this creates and accordingly the institutional need for its regulation imposing a 25% co-pay on a kosher-receiving inmate for whatever is the acknowledged extra cost[1] of the concededly better meals[2] over and above standard prison fare. The DOC gives a number of reasons for establishing this, but the two major ones which I feel require addressing are: (1) serious potentially eruptible frictions, real and subliminal between those who get and those who can’t; (2) security concerns, some of various unpredictable and troublesome kinds, which occasion extra expense of greater or lesser degree.[3]
It hardly needs stating that one who is getting a recognizably inferior meal is envious of one who, for whatever reason, is getting a superior meal, which may cause an exacerbated reaction in a criminal penitentiary setting of perpetual confinement.[4] The testimony of John Suthers, Executive Director of the DOC before the District Court is illustrative:
“As I indicated everything we do in DOC has ramifications typically beyond the specific issue. This case, for example, there are inmates in DOC waiting to see the outcome of this case, and if DOC is required to provide a religious meal free of cost, that will open the door to some that I can’t even fathom at this present time to seek similar sorts of treatment. When you have a co-pay our experience is that doesn’t happen.”
THE COURT: What’s the factual basis for your concern that this case could lead to a proliferation of requests for religious diets?
*1194 THE WITNESS: Your Honor, the factual basis is just about everything we do leads to — if inmates perceive that someone else is getting something that they’re not getting — and you can look at this as kosher or not. You can look at the particular food offering. Let’s say somebody’s saying, well, they’re getting fresh vegetables, or something like that. They will make similar demands.
It is therefore the considered view of the DOC that the existence of a co-pay requirement for some portion of the extra cost can have the effect of dampening this tension between the kosher receivers and the non-receivers because the non-receivers are aware that the receivers are paying something for it. This, it seems to me to be a reasonable and permissible[5] response within the teaching of Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).
... [JJudgments regarding prison security “are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters. ”
Id. at 86, 107 S.Ct. 2254. (Emphasis supplied).
.. .[WJhen a prison regulation impinges on inmates’ constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if “prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.”
Id. at 89, 107 S.Ct. 2254. (Emphasis supplied).
Especially appropriate is Turner, 482 U.S. at 90, 107 S.Ct. 2254.
.. .A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison’s limited resources for preserving institutional order. When accommodation of an asserted right will have a significant “ripple effect” on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials.[6]
Id. at 90, 107 S.Ct. 2254.
Given the foregoing and given the DOC’s perception of the situation it is *1195 facing, it is my view that the DOC’s response — a co-pay regulation — is not an exaggerated response and is conceptually reasonable as related to its legitimate governmental interest in dampening a potentially troublesome prison situation created by the difference in the quality of meals, as well as other interests listed above.
Only remaining is the question whether on this record evidence as to the problems the regulation would address was sufficiently put before the court below, to the point where, under Turner, that court should have deferred to the DOC’s expert judgment and sustained the regulation. As to this, the majority concludes at p. 1191 that: “On this record, we are not convinced the district court erred in holding the DOC simply failed to make its case that either its budget or its guards or other inmates would be more than minimally impacted.” While I see more in the DOC’s presentation, I am not prepared to say that the DOC here crossed the line demarcating its burden although the harbingers suggest that the DOC may need and be compellingly able tq press these issues before our courts again at some future time. Accordingly, I concur in today’s majority’s affirmance.

. See the District Court’s acknowledgment at 82 F.Supp.2d, 1190, 1197, "The parties agree that the cost of providing kosher meals is greater than the cost of the non-kosher diet served to the general population."

. See the District Court’s opinion id. at 1198: "If an inmate must pay for kosher meals, there may well be fewer requests from inmates who want the kosher diet simply because it breaks routine or seems more desirable than the general fare." (Emphasis supplied).
And there is specific supporting testimony of Dona Zavislan, Food Service Director for the DOC in the record before the District Court:
Q: Are you familiar with the individual who tried to intervene in this case?
A: I've heard about that, yes, Mr. Boles or—
Q: Mr. Boles. And he said that — I think his phrase was he was looking longingly at the plump, fresh vegetables and the gourmet TV dinners?
A: Yes, I’ve heard that.
Q: Is that what you’re serving for those on the kosher diet program?
A: I wouldn't characterize it as such myself.
Q: But at least there’s one individual who perceives it as such?
A: That’s true.

. For example, in the plaintiffs’ facility, the DOC has built and furnished utilities for a separate fenced-off kitchen unit in which the three kosher-receiving inmates prepare their meals. As another example, when tuna is on their diet, the lid of each small can of specially-purchased kosher tuna must be removed and taken away by a guard from the said separate kitchen unit. The obvious reason for this is that on removal, a lid could be used as a dangerous weapon.

. It may be appropriate to keep in mind that not only are prison conditions breeding grounds for tensions large and small, but prison officials are dealing with those tensions affecting inmates both peaceful and those imprisoned for acts of violence, and consequently potentially a risk to guards and other inmates if self-control or other is lost.

. The concept of reasonable co-pay regulations is not in serious question, and on this record it appears that efforts to collect negative balances from prisoners after release are never made.

. [Footnote by the writer hereof.] The majority in its opinion mentions the DOC calling attention to the possibility that providing kosher meals will cause a flood of litigation from other inmates. The majority rejects this at p. - of its opinion. The testimony of Ms. Zavislan in the record in this area is at least a beginning.
Q: To your knowledge have there been any other requests by Jewish inmates who have requested kosher meals?
A: I’ve had 14. Those are representing inmates that are still in the department. There have been others that have left.
Q: Okay. In terms of that have you provided a diet to any of those 14 individuals?
A: A kosher diet? No.
Q: A kosher diet.
A: No.
Q: Okay. Why not?
A: For all the reasons we have been discussing, the cost, the difficulty, the *1195 physical plant issues, trying to make sure that we keep items kosher, not only buy them that way, concerns about having specific groups, perhaps at least with the perception of some treated better than others, having their own special preparation area. All of those kinds of concerns. Concerns about many more inmates wanting something special and different and a proliferation of requests from that sort of thing.
Q: To your knowledge do any of these 14 individuals have lawsuits currently pending?
A: There are four I know of.