**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 11 2002**

**PATRICK FISHER**
Clerk

**PUBLISH**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

---

CHARLES E. BEERHEIDE, SHELDON
PERLMAN, and ALLEN ISAAC FISTELL,

    Plaintiffs-Appellees,

v.

JOHN W. SUTHERS, Executive Director,
Colorado Department of Corrections;
GERALD M. GASKO, Acting Deputy
Director, Colorado Department of
Corrections; DONA ZAVISLAN, Food
Service Administration, Colorado Department
of Corrections; LEE HENDRIX, Volunteer
Service Administrator, Colorado Department
of Corrections; and DOES 1 THROUGH 10,

    Defendants-Appellants.

---

AMERICAN CIVIL LIBERTIES UNION,
ALEPH INSTITUTE, and JEWISH
PRISONER SERVICES INTERNATIONAL,

    Amici Curiae.

No. 00-1086

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 95-B-2325, 95-B-2326 & 95-B-2481)**

---

Jennifer M. Dechtman, Assistant Attorney General, State of Colorado, Denver,
Colorado (Ken Salazar, Attorney General, State of Colorado, Denver, Colorado,

with her on the briefs), for Defendants-Appellants.

Scot M. Peterson of Koff, Corn & Berger, P.C., Denver, Colorado, for Plaintiffs-Appellees.

Stephen E. Abrams of Perkins Coie LLP, Denver, Colorado, filed an amicus curiae brief for American Civil Liberties Union.

Isaac M. Jaroslawicz, Director of Legal Affairs, the Aleph Institute, Surfside, Florida, filed an amici curiae brief for The Aleph Institute and Jewish Prisoner Services International.

---

Before **SEYMOUR**, and **PORFILIO**, Circuit Judges, and **OWEN**,[*] District Judge.

---

**SEYMOUR**, Circuit Judge.

---

Charles Beerheide, Sheldon Perlman, and Allen Fistell brought suit under 42 U.S.C. § 1983, claiming their First Amendment right to free exercise of their religion was violated when they were not provided kosher meals while incarcerated in the Colorado prison system. Defendants John Suthers, Gerald Gasko, Dona Zavislan, and Lee Hendrix, officials of the Colorado Department of Corrections (DOC), appeal from the district court's decision in favor of plaintiffs

---

[*] The Honorable Richard Owen, United States District Court for the Southern District of New York, sitting by designation.

following trial to the court. We affirm.[1]

## I.

In December 1996, plaintiffs filed a motion for a preliminary injunction on their claims that the DOC's failure to provide a kosher diet violated their rights under the Free Exercise Clause of the First Amendment to the Constitution and the Religious Freedom Restoration Act. After evidentiary hearings and a recommendation from a magistrate judge, the district court conducted a *de novo* review of the facts and legal analysis in the recommendation and defendants' objections thereto. On March 16, 1998, the court entered a preliminary injunction directing the DOC to provide kosher food to plaintiffs free of charge and in accordance with Orthodox Jewish law. *Beerheide v. Zavaras*, 997 F.Supp. 1405, 1413 (D.Colo. 1998) (*Beerheide I*).

While the case was pending, the Religious Freedom Restoration Act was declared unconstitutional in *Flores v. City of Boerne*, 521 U.S. 507 (1997). The district court thereafter reviewed the case under pre-RFRA standards. *See Beerheide v. Suthers*, 82 F.Supp.2d 1190, 1192 (D.Colo. 2000) (*Beerheide II*).

---

[1] The Amicus briefs filed in this case were vigorously opposed by the DOC, who moved this court to strike the briefs from the record. App. Motion to Strike (Jan. 10, 2001). As we do not rely on factual matters presented in those briefs that were not established at trial, we deny the DOC's motion.

The district court held a bench trial at which the parties stipulated that "the findings of fact and conclusions contained in *Beerheide I*, are adopted for purposes of the trial of the following remaining issues in this case: 1) Plaintiff Beerheide's sincerity of belief in Judaism; 2) Plaintiff Fistell's sincerity of belief in Judaism; and 3) the constitutionality of [defendants'] proposed kosher diet cost-sharing program." *Id.* at 1192.

After considering the evidence, the district court found the following facts:

> Plaintiffs are inmates at Fremont Correctional Facility, one of twenty-one adult correctional facilities in the State of Colorado Department of Corrections housing approximately 10,000 to 12,000 inmates. Mr. Beerheide, whose father is Jewish, was not raised Jewish and did not practice Judaism before he was incarcerated. After Mr. Beerheide was sent to prison, he became interested in Judaism, studied Judaism, and has followed the tenets of orthodox Judaism since 1994. Mr. Fistell, born and raised in the Jewish faith, has not always been an observant Jew. At some time after his commitment to the DOC, Mr. Fistell resumed practicing orthodox Judaism. Mr. Perlman, born in 1933, was raised in an orthodox Jewish family. Until approximately 10 years before he was incarcerated in 1989, Mr. Perlman kept a kosher home. After his incarceration, Mr. Perlman resumed his practice of orthodox Judaism. Plaintiffs testified that they wish to observe the practices of orthodox Judaism including eating only kosher food.

> Rabbi Yisroel Engle, qualified by the Court as an expert witness on Jewish law and Jewish dietary law, testified that "keeping kosher" is a central tenet of orthodox Judaism. Rabbi Steven Foster, an expert witness on Jewish law and Jewish conversion, agreed. As outlined in *Beerheide I*, "keeping kosher" includes adherence to specific rules concerning which foods may be eaten and which are forbidden. Foods that may be eaten include all non-animal products such as fruits and vegetables, meat from animals without cloven hooves including cows and sheep, and fish which have fins and scales. "Kosher" also dictates specific methods by which allowable

-4-

foods are prepared for consumption. For example, kosher food is no longer "kosher" if it is prepared in containers which have held non-kosher food. To keep kosher foods untainted, containers, pots and pans, utensils, and all other implements used in their preparation must not come into contact with any item that is or has had contact with nonkosher food. Also, to keep kosher food "kosher," it must be served on plates and bowls and eaten with utensils which have not had nonkosher contact. *See Beerheide I*, 997 F.Supp. at 1408-09.

It is undisputed that after the issuance of the preliminary injunction in this case, the DOC Food Services department began serving Plaintiffs a kosher diet. To assist in the implementation of the program, DOC set up a modified kosher kitchen within the regular prison kitchen. Mr. Beerheide began working in the kitchen in a special locked and caged area set aside for the preparation of the kosher food trays for himself, and his co-Plaintiffs. In addition, DOC has provided a microwave oven, preparation table, two cutting boards, two non- disposable knives, one pot, one pan, plastic tubs, plastic storage drawers, plastic wear and trays, butcher paper, and aluminum foil for exclusive use in the preparation of the kosher meals. Beerheide Testimony, October 12, 1999. The parties agree that the cost of providing a kosher diet to Plaintiffs is higher than the cost of the general fare.

*Beerheide II*, 82 F.Supp.2d at 1192-93. Applying the standards relevant to the alleged denial of a prisoner's constitutional rights, *see Turner v. Safley*, 482 U.S. 78, 89-91 (1987), the district court concluded that the DOC had violated plaintiffs' First Amendment right to the free exercise of their religion by failing to provide them with a kosher diet. The court entered a permanent injunction requiring DOC to provide plaintiffs with a "diet that complies with the kosher dietary requirements of orthodox Judaism at no cost to Plaintiffs." *Beerheide II*, 82 F.Supp.2d at 1200.

On appeal, the DOC asserts the district court wrongly applied *Turner v. Safley* in holding not only that the DOC must make a kosher diet available, it must also provide the diet with no contribution from the inmates. Specifically, the DOC also maintains the court erred in rejecting its proposal that it be allowed to charge prisoners a co-payment of 25% of the extra cost of kosher meals.

**II.**

In a long line of cases, the Supreme Court has recognized that prisoners retain constitutional rights when incarcerated. The Court has reiterated that "'convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison.'" *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (quoting *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)); *see also Turner*, 482 U.S. at 84 ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."). In some instances, however, constitutional rights must be curtailed due to the very fact of incarceration or for valid penological reasons. *O'Lone*, 482 U.S. at 348. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

The *Turner* decision marked a confirmation of the Supreme Court's deferential approach in matters of prison administration and the constitutional

rights of prisoners. In a series of cases throughout the 1970s, the Court held that regulations promulgated by prison officials should be upheld by courts unless the regulations are shown to be unreasonable or an exaggerated response to administrative and security concerns. *See Pell v. Procunier*, 417 U.S. 817, 827 (1974) (regulation upheld unless substantial evidence that it constitutes exaggerated response to security and administrative concerns); *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 128 (1977) (If security concerns unreasonable, corrections officials required to show further justification for regulations); *Bell v. Wolfish*, 441 U.S. 520, 550 (1979) (inmates' rights not violated if rule rational response to an obvious problem).

One case, *Procunier v. Martinez*, 416 U.S. 396 (1974), required that prison officials meet a "least restrictive" means test if their regulations infringed on the constitutionally-protected rights of *non*-prisoners. Because some circuits adopted the *Martinez* test as the standard for all prisoner rights cases, the Supreme Court in *Turner* clarified its standard. *Turner* reiterated the view that "[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Turner*, 482 U.S. at 84 (quoting *Martinez*, 416 U.S. at 405). The Court plainly stated that its decision was driven by a concern that courts had become unnecessarily involved in the day-to-day affairs of prison administration. *Id.* at 89.

*Turner* recognized the institutional capabilities possessed by prison officials. "[J]udgments regarding prison security 'are particularly within the province and professional expertise of corrections officials, and in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id.* at 86 (quoting *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119 (1977). Thus, if a regulation is reasonably related to legitimate penological interests (a determination made by applying the four-pronged test discussed below), the regulation is valid. *Id.* at 89. "[S]uch a standard is necessary if 'prison administrators. . ., and not the courts, [are] to make the difficult judgments concerning institutional operations." *Id.* at 89 (quoting *Martinez*, 416 U.S. at 407).

*Turner* constituted a corrective to decisions that granted prison officials next to no deference in how they accommodated the rights of prisoners. At the same time, it did not take from the courts all power to interpret and apply the Constitution within the prison context. As discussed below, *Turner* itself found a prison system's regulation banning inmate marriages to be unreasonable and thus struck it down. *See Turner*, 482 U.S. at 97-99; *see also Lile v. McKune*, 224 F.3d 1175 (10th Cir. 2000), *cert. granted*, 532 U.S. 1018 (2001); *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205 (10th Cir. 1999).

In order to balance the guarantees of the Constitution with the legitimate concerns of prison administrators, *Turner* requires a court to determine: (1) whether a rational connection exists between the prison policy regulation and a legitimate governmental interest advanced as its justification; (2) whether alternative means of exercising the right are available notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights. *See Turner*, 482 U.S. 89-91; *see also Makin*, 183 F.3d at 1209. *Turner* thus requires courts, on a case-by-case basis, to look closely at the facts of a particular case and the specific regulations and interests of the prison system in determining whether prisoners' constitutional rights may be curtailed. The DOC contends that under the *Turner* analysis it is not constitutionally required to provide a kosher diet to prisoners, and that if it is so required, it should be allowed to charge a co-payment to those prisoners who participate in the kosher meal program.

This circuit recognizes that prisoners have a constitutional right to a diet conforming to their religious beliefs. *LaFevers v. Saffle*, 936 F. 2d 1117, 1119-20 (10th Cir. 1991); *see also Makin*, 183 F.3d at 1214 (failure to accommodate Muslim fasting requirements during Ramadan infringed on inmate's First

Amendment rights). In *Makin* we were presented with a narrow question of law: whether defendants improperly infringed on the plaintiff's right to observe Ramadan. *Makin*, 183 F.3d at 1211. Similarly, we must determine here whether defendants have improperly infringed upon plaintiffs' right to observe the dietary laws of Judaism. In assessing whether the district court properly applied *Turner*, we review its underlying factual findings for clear error but we review its legal determinations de novo. *See id.* at 1211.

A.

Under the *Turner* analysis, the first determination is whether a rational connection exists between the prison policy and a legitimate governmental interest advanced as its justification. *Turner*, 482 U.S. at 89. At trial, the DOC proffered two penological interests to justify its policy against providing Kosher diets: budgetary concerns, and other prisoners' responses to the provision of such a diet. *Beerheide II*, 82 F.Supp.2d at 1197.[2] The district court found both these

_____

[2] At the preliminary injunction phase, the DOC argued that its policy of not providing religious diets was also justified by a concern that so providing would lead to the proliferation of other lawsuits. *Beerheide I*, 997 F.Supp. at 1412. The district court rejected this justification outright using compelling reasoning:

> The concern of proliferation of lawsuits seeking various accommodations is speculative at best. Moreover, to deny these plaintiffs their right to observe a central tenet of their religion on the ground that it might lead to other lawsuits is specious. The DOC's logic would effectively preclude provision

(continued...)

-10-

concerns were legitimate DOC interests, and held that this factor weighs in favor of defendants. *Id.* We agree. To satisfy this prong of the test, the prison administration is required to make a minimal showing that a rational relationship exists between its policy and stated goals. Without doubt, prison administrators have a legitimate interest in working within a fixed budget. Moreover, there is a legitimate concern that other inmates' might react negatively to providing some prisoners with a kosher diet.[3]

---

[2](...continued)
of any accommodations for religious practices in prison. Prisoners retain the right to the protections of the First Amendment, including the free exercise of religion. To deny plaintiffs their right to free exercise of their sincerely held religious beliefs because it might lead to other inmates filing lawsuits is unreasonable.

*Beerheide I*, 997 F.Supp. at 1412 (citation omitted). Denying protection of a constitutional right in order to prevent other inmates from seeking recognition and enforcement of their constitutional rights is contrary to the most basic principles of our system of government. As the Supreme Court declared in *Turner*, 482 U.S. at 84, because prisoners retain constitutional rights, when "a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *See also Procunier v. Martinez*, 416 U.S. 396, 405-406 (1974).

[3] In its brief, the DOC contends the district court erred in applying this first prong. Aplt. Br. at 21-22. The DOC's argument appears premised upon a misreading of the district court's application of the *Turner* factors. The court ruled in favor of the DOC on the first factor. The court's discussion to which the DOC objects was in fact directed not to the first factor but to the third factor, i.e., the impact of the co-payment program on inmates, guards and prison resources. *See Beerheide II*, 82 F. Supp.2d at 1197-98.

B.

The second determination is whether plaintiffs have alternative means by which to exercise the right to maintain a kosher diet. The district court rejected two alternatives proffered by the DOC. The DOC argued that plaintiffs could purchase kosher meals in the prison canteen. The evidence showed, however, that plaintiffs were financially unable to exercise this option due to the high cost of canteen meals. The DOC also asserted that the Jewish community could provide kosher food to prisoners. The district court found that daily provision of kosher food by the community is not feasible. Moreover, the court cannot order community groups to provide food. The court thus concluded that plaintiffs have no "viable alternative to observing the essential tenet of Judaism of eating a kosher diet." *Id.*

On appeal, the DOC contends the district court failed to address testimony that inmates could obtain an "alternative religious diet" free of charge through the prison's "common fare" program. Aplt. Br. at 23. Meals in this program are prepared with no pork or pork by-products, or are vegetarian. In its brief, the state claims that while the diet does not meet the "strictest orthodox standards," it "meets the basic tenants [*sic*] of a kosher diet." *Id.*

Testimony showed kosher laws do not deal simply with whether a food item does or does not contain pork or other non-kosher animal products. Kosher laws

govern not only the ingredients (both animal and vegetable), but the source,

storage, and preparation of those ingredients, and the service of meals.  A

vegetarian meal prepared in a non-kosher kitchen is not kosher.[4]  *See Ashelman v.*

*Wawrzaszek*, 111 F.3d 674, 675 & n.2 (9th Cir. 1997); *see also* Gerald F.

Masoudi, *Kosher Food Regulation & The Religion Clauses of the First*

*Amendment*, 60 U. Chi. L. Rev. 667, 669 (1993).  The DOC's alleged

"alternative," then, is not an alternative at all.  The district court did not commit

clear error in failing to find facts favorable to the DOC.

The district court also correctly applied the law.  In upholding a restriction

on inmate-to-inmate correspondence, the Supreme Court in *Turner* found that

---

[4]  Even the DOC's own expert witness, Rabbi Steven A. Foster,
acknowledged on cross-examination that a vegetarian kitchen is not necessarily a
kosher kitchen.

> Q If I have a kosher kitchen that's isolated from all other kitchens,
> that's a kosher kitchen and that can maintain itself as a kosher
> kitchen, correct?
> A Yes.
> Q And it doesn't matter whether that kitchen serves vegetables, or
> whatever, as long as the food that goes in is kosher, the product goes
> out is kosher, and it's isolated, then that's a kosher kitchen, correct?
> A Yes.
> Q And you can maintain that kitchen as a vegetarian kitchen if you
> want to, correct?
> A Yes.
> Q And it doesn't lose its character as a kosher kitchen?
> A *It doesn't lose its character as a vegetarian kitchen that has not been*
> *abused by non-kosher foods.*

Aplt. App. vol. III at 968-969 (emphasis added).

while prison regulations barred communication with a limited class of people about whom officials had particular cause for concern, there remained many people with whom prisoners could still communicate. *Turner*, 482 U.S. at 92. Plaintiffs in this case are not presented with an alternative means of following Jewish dietary laws. Purchasing meals in the canteen is financially impossible for prisoners of limited means. The Jewish community cannot be expected or required to provide food to the prisoners. Nor is participation in the "common fare program" an alternative means of keeping kosher. The term "strict kosher" as used by the DOC is a misnomer. Under Orthodox *kashruth* law, a person either keeps kosher or he does not. *Ashelman*, 111 F.3d at 675 & n.2. In short, these suggestions are not sufficient alternatives to providing plaintiffs with a kosher diet.

That the plaintiffs are entitled to a kosher diet does not resolve whether the DOC can charge prisoners a co-payment for the added cost of kosher meals. Prior to the hearing on the injunction, the DOC proposed that any prisoner wishing to take part in the kosher meal program be required to make a co-payment of no more than 25% of the additional cost of providing the meals. The DOC proffered evidence (which the district court ultimately found unreliable) that the cost of a kosher diet is between $2.50 and $4.50 per meal. *Beerheide II*, 82 F.Supp.2d at 1196. The district court found that under the DOC's proposed co-payment plan, a

prisoner maintaining a kosher diet would be expected to pay $90 per month and would incur a debt to his or her inmate account if unable to pay.[5] The court expressed serious concerns about the implications of expecting prisoners to fall into debt in order to maintain their religious beliefs, questioning whether the proposed co-payment program would in fact run *counter* to penological goals.

> I have serious concerns that if Plaintiffs do not have sufficient funds to pay the 25% co-pay, their inmate accounts would maintain a negative balance to be turned over to DOC collections upon the inmate's discharge from prison. A major goal of parole is rehabilitation. See Griffin v. Wisconsin, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); Latta v. Fitzharris, 521 F.2d 246, 249 (9th Cir.1975) ("The overriding goal of the parole system is to give the parolee a chance to further and to demonstrate his rehabilitation while serving a part of his sentence outside the prison walls."). To begin parole with a financial debt to DOC runs counter to this laudatory goal. Moreover, it sets the questionable precedent of encouraging the inmate to spend money he does not have.

*Beerheide II*, 89 F.Supp.2d at 1198.

While $90 dollars a month may seem like a pittance, it must be assessed in

---

[5] To further support its position that it should be allowed to charge prisoners a co-payment for the provision of kosher meals, the DOC points to the fact that it uses a co-payment program as a means of preventing inmate abuse of the medical services program. The district court was not persuaded by this argument as the medical co-pay program (as amended following litigation) requires a co-payment only if inmates see a physician without a referral from a nurse or physician's assistant. Moreover, inmates are not charged a co-payment for medical services received as treatment for an ongoing or preexisting condition. The medical co-payment thus serves a gate-keeping function, but does not punish prisoners for requiring regular legitimate medical care. Consequently, the medical co-payment program is far less burdensome than the proposed kosher meal co-payment requiring a monthly fee for provision of religiously-mandated alimentation. *See Beerheide II*, 89 F.Supp.2d at 1199.

the prison context where inmates make between $1.00 and $1.87 per day for a maximum of $56.58 per month. App. vol. IV at 1236. Thus, a prisoner living solely on earnings from prison work would incur a debt of more than $30.00 per month in order to maintain his religious beliefs. One prison official testified that although prisoners may go into debt under the proposal, he had yet to see the state pursue a debt after a prisoner is released. App. vol. III at 917-18. Such an admission underscores the unreasonable nature of the 25% co-payment program. It would force prisoners into debt far beyond what they might earn, thus failing to teach prisoners about responsible spending, while doing little to curb costs per prisoner since the state does not regularly collect such debts upon release. In short, while contradicting other penological goals, it does little to further the stated goals of the prison system that could not be accomplished through a less onerous co-payment program.

Of course, prisoners sometimes receive money from family, friends, and other outside sources. DOC points to evidence that Mr. Fistell's inmate account averages over $100.00 per month and Mr. Perlman's account totaled nearly $100.00 per month in one year. Aplt. Br. at 9 (App. at 1216).[6] While Messrs.

_____

[6] According to testimony at trial, Mr. Beerheide's monthly earnings were only $30.00. App. vol. IV at 1238. At the time of trial all, three plaintiffs carried much lower balances in their inmate accounts. Mr. Beerheide had $19.86 available, Mr. Perlman had $87.50, and Mr. Fistell had only eight cents ($00.08).

(continued...)

Fistell and Perlman are fortunate to have more than the minimal income prisoners earn from their work, the co-payment would require even them to sacrifice nearly all of that income to maintain their religious duties, leaving little or no money for other essentials such as stationary, telephone calls, medication, medical visits, and clothing. App. vol III at 869. Forcing prisoners to decide between communicating with family and legal representatives, seeking medical treatment, and following religious tenets constitutes a Hobson's choice rather than a true alternative.

Thus, while meeting the proposed co-payment of 25% of additional cost might not be impossible for some prisoners, we cannot say the district court erred in concluding *on this record* that the DOC proposal was not a reasonable alternative, particularly when, as discussed below, there are alternative means of accommodating the plaintiffs' right to kosher meals at a minimal cost to the prison.

C.

Third, the district court was required to determine what effect accommodating the exercise of the right would have on guards, other prisoners,

_____

[6](...continued)
App. vol. IV at 1215.

-17-

and prison resources generally. *Turner*, 482 U.S. at 90. *Turner* makes clear that our task is to determine whether the prison regulations are reasonably related to the penological goals and concerns laid out by the prison administration. *Id.* In *Turner*, the prison officials identified both security and rehabilitation concerns to support a regulation that permitted an inmate to marry only with the permission of the superintendent of the prison and provided that such permission should be given only if there were compelling reasons to do so. *Id.* at 97, 82. Officials testified that female prisoners were often overly dependent on male figures and subject to abuse in marriage, and that such abuse was connected to the crimes they committed. *Id.* at 97. The prison superintendent testified that the policy was also driven by the rehabilitative goal of developing skills of self-reliance. *Id.* The policy was presented as the result of the prison Superintendent's experience in operating the prison. *Id.* The policy furthered prison security concerns by avoiding the creation of "love triangles" within the prison. *Id.* at 98.

The Court rejected the evidence presented by prison officials and held that the regulation was not reasonably related to the prison's stated concerns and goals. Referring to the rehabilitative goals, the Court found the regulation "sweeps much more broadly" than necessary to achieve those goals. *Id.* As to the security objectives, the Court relied on its own "common sense," *id.*, to summarily reject the evidence presented by the prison, concluding that obvious, easy

-18-

alternatives to the regulation existed that imposed a *de minimis* burden on the pursuit of the prison's objectives. *Id.* Thus, while *Turner* requires us to defer to the expertise of prison officials, that deference is not absolute. In order to warrant deference, prison officials *must present credible evidence* to support their stated penological goals. *See Lile*, 224 F.3d at 1191; *Makin*, 183 F.3d at 1213-1214.

On appeal, the DOC argues that providing kosher meals in prison would impact the prison's financial resources, "people resources," and administration. Aplt. Br. at 24. In applying *Turner*'s third prong, the district court considered two factors: cost and program abuse. The court recognized that the cost of providing kosher meals is greater than the cost of providing non-kosher meals. Nevertheless, evidence of the *actual* cost of kosher meals was elusive. One witness' testimony differed each of three times she testified, leading the district court to find, "Further testimony revealed that DOC's cost estimate is fluid at best and appears unreliable." *Beerheide II*, 82 F.Supp.2d at 1197-1198. The reliability of cost reports was further undermined by testimony revealing that the kosher meals budget was charged for case lots of kosher fruits and vegetables that were far too large for plaintiffs to consume in a timely fashion. Rather than use the excess amounts to feed the general prison population, as one would logically expect, the food was left to rot, resulting in significant waste. Based on this

evidence, the district court found that "DOC's cost estimates are unreliable and cannot serve as a valid basis of an assessment of the cost of the kosher diets." *Id.* at 1198.

The DOC contends on appeal that it is "indisputable" kosher meals will cost the prison more than regular meals. We agree, but we cannot say the district court was clearly erroneous in finding that it could not evaluate the impact on the DOC budget on this record. The DOC failed to present reliable evidence that the cost impact would be more than *de minimis*.

The DOC also challenges the district court's determinations relating to the impact on guards and other inmates. *See Turner*, 482 U.S. at 90. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.* However, the Supreme Court also recognizes that "few changes will have *no* ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order." *Id.* In other words, prison officials cannot simply point to *any* impact to win their case.

On the record before us, the DOC's evidence to support the alleged impacts that implementation of the kosher meal program without a co-payment would have on the guards implementing the program is tenuous, at best. The DOC

points to only two pieces of testimony to support its claim. First, it relies on the food service supervisor for the Fremont Correctional Facility who testified that the program has put those inmates who prepare the meals in a position of power vis-à-vis guards due to the guards' unfamiliarity with the provisions of kosher laws and the prison's policy regarding their provision. Such difficulties, however, stem from the difficulties inherent in implementing any new policy. As guards quickly become familiar with the DOC-promulgated kosher regulations, such tensions will likely ease. Moreover, such testimony simply isn't relevant to whether a co-payment should be charged for provision of kosher meals. There will be friction between guards and prisoners as the kosher policy is implemented independent of the co-payment.

Second, the DOC points to testimony regarding difficulties the Oregon prison system had in implementing its kosher meal program. However, the Oregon program was a model of illogic because, when it was introduced, it placed no restrictions whatsoever on who could participate in the program.[7] After

---

[7] The DOC relies on the testimony of Chaplain Gary Friedman of Jewish Prisoner Services International, who worked with the Oregon prison system to implement its kosher diet plan.

> Q. How many people take advantage of the kosher plan?
> A. Initially, we had 500 who applied when we opened it to *everybody*. At present, we whittled it down to a couple of dozen that are approved.

Aplt. App. vol. IV at 1311 (emphasis added). Chaplain Friedman admitted that

(continued...)

hundreds of prisoners enrolled as participants, state prison officials were forced to undertake a lengthy administrative process after the fact in order to screen each applicant and keep in the program only those prisoners whose religious beliefs required them to keep kosher.   All the evidence here shows the DOC has no intention of implementing such a poorly-designed program.  On the contrary, it already has in place a well-established system that serves as a screen to keep out prisoners who seek to participate in the kosher meal program without a legitimate reason.  The DOC regulations require an inmate to file a request for a religious diet documenting his or her religion's dietary laws, and allow an inmate to change religious affiliation only once a year.  The district court found "the effectiveness of DOC's current method of testing an inmate's religious sincerity is demonstrated by the fact that relatively few inmates, fourteen, have sought to keep kosher since the preliminary injunction was issued in the case." *Beerheide II*, 82 F.Supp.2d at 1199.

The DOC also erroneously asserts the district court erred in failing to address the impact a kosher meal program will have on other inmates.  In so doing, the DOC points to no evidence that shows how providing kosher meals to

_____

[7](...continued)
when Oregon commenced its kosher plan it was "available to everybody or anybody who wanted to participate." *Id*. at 1267.  In short, Oregon's plan, when established, was wholly unregulated, whereas Colorado's is not.

Orthodox Jewish prisoners might affect other prisoners except to influence them to seek religious diets as well. The DOC's argument turns on the possibility that providing kosher meals might cause "a floodgate of litigation and equal protection claims" from other inmates seeking religious meals. The district court addressed this argument and rejected it in its ruling at the preliminary injunction phase of trial. *Beerheide I*, 997 F.Supp at 1412. We agree that this is a specious argument and reject it as well. *See supra* n.2.

In sum, while courts must defer to prison officials on such matters, *Turner* and its progeny do not give prison officials absolute deference. They must still make their case by presenting evidence, however minimal that evidence might be. On this record, we are not convinced the district court erred in holding the DOC simply failed to make its case that either its budget or its guards or other inmates would be more than minimally impacted.

D.

The fourth and final prong of the *Turner* test required the district court to look at the presence or absence of ready alternatives that would fully accommodate the plaintiffs' rights at *de minimis* costs to valid penological interests of the DOC. *Id.* at 90. According to *Turner*, the existence of "obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an

'exaggerated response' to prison concerns." *Id.* The district court found on the record before it that providing prisoners with kosher meals free of charge while using a selective screening method unrelated to money was an available alternative with a *de minimis* impact on DOC's annual food service budget, $13,000 out of $8.25 million, or .158 percent, even accepting DOC's cost estimate despite the fact that the district court found it unreliable, *see Beerheide II*, 82 F.Supp.2d at 1200. Under these circumstances, the district court concluded that charging a co-payment that plaintiffs couldn't afford was not rationally related to the stated penological goals of cost and prisoner abuse of the program.

On appeal, the DOC contends the district court erred in applying *Turner*'s fourth prong, citing to evidence that the co-payment policy is reasonable. In doing so, the DOC misinterprets *Turner*. In applying the fourth *Turner* factor, courts are to look for obvious, easy alternatives to the prison's asserted policy and examine whether the impact of those alternatives on penological goals is *de minimis*. As the Supreme Court held:

> [I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Id.* at 90-91 (citation omitted). We emphasize, as did the Supreme Court in *Turner*, that this is not a least restrictive alternative test. Prison officials need not demonstrate they have considered or tried all other methods of dealing with the

-24-

issue before courts will be satisfied with the prison's resolution.  *Turner*, 482

U.S. at 91.

Absent convincing evidence that the cost to valid penological goals of

providing kosher meals without a co-payment is other than *de minimis*, a program

that provides prisoners with kosher meals free of charge fits well into the

category of "quick, easy alternatives."  We are convinced, as was the district

court, that the reasons given for the co-payment program, controlling cost and

abuse, are barely impinged upon by provision of the meals free of charge rather

than with a co-payment to the few prisoners who have met the prison's stringent

standards for receiving a kosher diet.  The district court correctly observed that

the DOC's tested method of screening inmates for religious diet programs serves

the same goals the co-payment allegedly serves by controlling both cost and

abuse[8] without making prisoner observance of kosher laws a matter of choosing

---

[8]  As the district court noted, the DOC has strict rules for staying on a kosher diet even after the prisoner becomes entitled to one.  Once a prisoner convinces the DOC that the sincerity of his beliefs and the dictates of his religion entitle him to a religious diet, he may lose this privilege for any of the following reasons:
> a.  An offender is observed violating religious dietary requirements.
> b.  An offender is observed providing all or portions of their specially prepared meal to other offenders.
> c.  An offender is observed eating both their specially prepared meal and the general diet meal offered to the general population.
> d.  It is determined that an offender no longer practices the associated religion.

(continued...)

between incurring significant debt or defiling their bodies. As the Ninth Circuit

has usefully observed, there is a distinction between

> a religious practice which is a positive expression of belief and a
> religious commandment which the believer may not violate at peril of
> his soul. It is one thing to curtail various ways of expressing belief,
> for which alternative ways of expressing belief may be found. It is
> another thing to require a believer to defile himself, according to the
> believer's conscience, by doing something that is completely
> forbidden by the believer's religion.

*Ward v. Walsh*, 1 F.3d 873, 878 (9th Cir. 1993).

## III.

In sum, the district court held that the DOC's proposed co-payment plan

was not rationally related to the legitimate penological concerns of cost and

abuse. *Beerheide II*, 82. F.Supp.2d at 1200. We easily conclude on this record

that the district court's findings of fact are not clearly erroneous, nor are its

conclusions of law incorrect.

We **AFFIRM** the judgment of the district court.

---

[8](...continued)
*Beerheide II*, 82 F.Supp.2d at 1199.

**BEERHEIDE v. SUTHERS, No. 00-1086**

**OWEN**, District Judge, concurring.

I am one with the majority holding that a prison inmate with sincerely-held religious beliefs should, under normal circumstances, receive meals that conform to those beliefs. Here, the three plaintiff inmates have satisfied the prison authorities of the sincerity of their beliefs and in their facility are receiving such meals. What compels this concurring opinion is the majority's giving minimal credit to the Colorado Department of Corrections' (DOC) perception of the problems this creates and accordingly the institutional need for its regulation imposing a 25% co-pay on a kosher-receiving inmate for whatever is the acknowledged *extra* cost [1] of the concededly better meals [2] over and above standard

---

[1] See the District Court's acknowledgment at 82 F. Supp.2d, 1190, 1197, "The parties agree that the cost of providing kosher meals is greater than the cost of the non-kosher diet served to the general population."

[2] See the District Court's opinion *id.* at 1198: "If an inmate must pay for kosher meals, there may well be fewer requests from inmates who want the kosher diet simply because it breaks routine or *seems more desirable than the general fare*." (Emphasis supplied).

And there is specific supporting testimony of Dona Zavislan, Food Service Director for the DOC in the record before the District Court:

Q:    Are you familiar with the individual who tried to intervene in this

(continued...)

prison fare. The DOC gives a number of reasons for establishing this, but the two major ones which I feel require addressing are: (1) serious potentially eruptible frictions, real and subliminal between those who get and those who can't; (2) security concerns, some of various unpredictable and troublesome kinds, which occasion extra expense of greater or lesser degree. [3]

It hardly needs stating that one who is getting a recognizably inferior meal is envious of one who, for whatever reason, is getting a superior meal, which may cause an exacerbated reaction in a criminal penitentiary setting of perpetual confinement. [4] The testimony of John Suthers, Executive Director of the DOC

---

[2](...continued)
```
           case?
    A:     I've heard about that, yes, Mr. Boles or - -
    Q:     Mr. Boles. And he said that - - I think his phrase was he was looking
           longingly at the plump, fresh vegetables and the gourmet TV
           dinners?
    A:     Yes, I've heard that.
    Q:     Is that what you're serving for those on the kosher diet program?
    A:     I wouldn't characterize it as such myself.
    Q:     But at least there's one individual who perceives it as such?
    A:     That's true.
```

[3] For example, in the plaintiffs' facility, the DOC has built and furnished utilities for a separate fenced-off kitchen unit in which the three kosher-receiving inmates prepare their meals. As another example, when tuna is on their diet, the lid of each small can of specially-purchased kosher tuna must be removed and taken away by a guard from the said separate kitchen unit. The obvious reason for this is that on removal, a lid could be used as a dangerous weapon.

[4] It may be appropriate to keep in mind that not only are prison conditions

(continued...)

before the District Court is illustrative:

> "As I indicated everything we do in DOC has ramifications typically beyond the specific issue. This case, for example, there are inmates in DOC waiting to see the outcome of this case, and if DOC is required to provide a religious meal free of cost, that will open the door to some that I can't even fathom at this present time to seek similar sorts of treatment. When you have a co-pay our experience is that doesn't happen."
>
> \*　　\*　　\*
>
> THE COURT: What's the factual basis for your concern that this case could lead to a proliferation of requests for religious diets?
>
> THE WITNESS: Your Honor, the factual basis is just about everything we do leads to - - if inmates perceive that someone else is getting something that they're not getting - - and you can look at this as kosher or not. You can look at the particular food offering. Let's say somebody's saying, well, they're getting fresh vegetables, or something like that. They will make similar demands.

It is therefore the considered view of the DOC that the existence of a co-pay requirement for some portion of the extra cost can have the effect of dampening this tension between the kosher receivers and the non-receivers because the non-receivers are aware that the receivers are paying something for it. This, it seems to me to be a reasonable and permissible [5] response within the

------

[4](...continued)
breeding grounds for tensions large and small, but prison officials are dealing with those tensions affecting inmates both peaceful and those imprisoned for acts of violence, and consequently potentially a risk to guards and other inmates if self-control or other is lost.

[5] The concept of reasonable co-pay regulations is not in serious question, and on this record it appears that efforts to collect negative balances from prisoners after release are never made.

teaching of *Turner v. Safley*, 482 U.S. 78 (1987).

> . . .[J]udgments regarding prison security "are peculiarly within the province and professional expertise of corrections officials, *and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.*"

*Id.* at 86. (Emphasis supplied).

> . . .[*W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.* In our view, such a standard is necessary if "prison administrators . . ., and not the courts, [are] to make the difficult judgments concerning institutional operations."

*Id.* at 89. (Emphasis supplied).

Especially appropriate is *Turner* at 90.

> . . .A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order. When accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or

on prison staff, courts should be particularly deferential to the

informed discretion of corrections officials.[6]

*Id.* at 90.

Given the foregoing and given the DOC's perception of the situation it is facing, it is my view that the DOC's response -- a co-pay regulation -- is not an exaggerated response and is conceptually reasonable as related to its legitimate governmental interest in dampening a potentially troublesome prison situation

---

6 [Footnote by the writer hereof.] The majority in its opinion mentions the DOC calling attention to the possibility that providing kosher meals will cause a flood of litigation from other inmates. The majority rejects this at p. 23 of its opinion. The testimony of Ms. Zavislan in the record in this area is at least a beginning.

Q:  To your knowledge have there been any other requests by Jewish inmates who have requested kosher meals?
A:  I've had 14. Those are representing inmates that are still in the department. There have been others that have left.
\* \* \*
Q:  Okay. In terms of that have you provided a diet to any of those 14 individuals?
A:  A kosher diet? No.
Q:  A kosher diet.
A:  No.
Q:  Okay. Why not?
A:  For all the reasons we have been discussing, the cost, the difficulty, the physical plant issues, trying to make sure that we keep items kosher, not only buy them that way, concerns about having specific groups, perhaps at least with the perception of some treated better than others, having their own special preparation area. All of those kinds of concerns. Concerns about many more inmates wanting something special and different and a proliferation of requests from that sort of thing.
\* \* \*
Q:  To your knowledge do any of these 14 individuals have lawsuits currently pending?
A:  There are four I know of.

-5-

created by the difference in the quality of meals, as well as other interests listed above.

Only remaining is the question whether on this record evidence as to the problems the regulation would address was sufficiently put before the court below, to the point where, under *Turner*, that court should have deferred to the DOC's expert judgment and sustained the regulation. As to this, the majority concludes at p. 23 that: "On this record, we are not convinced the district court erred in holding the DOC simply failed to make its case that either its budget or its guards or other inmates would be more than minimally impacted." While I see more in the DOC's presentation, I am not prepared to say that the DOC here crossed the line demarcating its burden although the harbingers suggest that the DOC may need and be compellingly able to press these issues before our courts again at some future time. Accordingly, I concur in today's majority's affirmance.