**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 15 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

ROBERT BOOTH ROE, a minor child
by and through his adoptive parents,
Richard Roe and Janet Roe, and
Jennifer Brunetti, conservator,

       Plaintiff-Appellant,

v.

MARY KEADY and WAYNE
SRAMEK, both as individuals and in
their official capacities as employees
of the Department of Social and
Rehabilitation Services for the State of
Kansas,

       Defendants-Appellees.

No. 02-3167

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 00-CV-2232-CM)

---

Submitted on the briefs:    *

Richard D. Loffswold, Jr., Girard, Kansas, for Plaintiff-Appellant.

Deborah June Purce, Topeka, Kansas, for Defendant-Appellee Mary Keady, and
Matthew W. Boddington, Topeka, Kansas, for Defendant-Appellee Wayne
Sramek.

---

\*      The case is unanimously ordered submitted without oral argument pursuant
to Fed. R. App. P. 34(a)(2) and 10th Cir. R. 34.1(G).

Before **SEYMOUR** , **KELLY** , and **LUCERO** , Circuit Judges.

**LUCERO** , Circuit Judge.


Richard and Janet Roe, adoptive parents to Robert Booth Roe, a minor

plaintiff, along with his conservator, brought suit under 42 U.S.C. §§ 1981

and 1983 against defendants, employees of the Kansas Department of Social and

Rehabilitation Services ("SRS"), for failing to conduct a proper inquiry into abuse

by his natural parents, Terri and Booth Tuthill.  They alleged that defendants had

a duty to investigate concerns about possible abuse voiced before and after

Robert's birth, that defendants relied improperly on the Bureau of Indian Affairs

("BIA") to look into and respond to the matter, and that this conduct reflected

discrimination based on Robert's status as a Native American.  On cross-motions

for summary judgment, the district court held that the evidence did not show any

actionable discriminatory animus behind defendants' conduct, and granted their

motion on the basis of qualified immunity.  This appeal followed.  On de novo

review,  see  Olsen v. Layton Hills Mall    , 312 F.3d 1304, 1311 (10   th Cir. 2002),

we affirm.

# I

There is little dispute about the events leading to Robert's injury by his biological father; this case turns on the proper assessment of the legal significance of these events. Two months before Robert's birth, an administrator at a mental-health center where Terri Tuthill was being treated for chronic mental illness sent a letter to SRS requesting a home study of the expectant parents. Defendant Mary Keady was assigned to the case by her supervisor, defendant Wayne Sramek, even though the requested home study was outside SRS policy, which did not contemplate action on behalf of a fetus absent a court order. The same day, after another party related concerns about drug use by the Tuthills, Keady went to their home and met with Terri Tuthill. Terri seemed unreceptive and alarmed by the visit, an impression confirmed to Keady by Terri's case manager at the mental-health center. On several subsequent occasions when Keady went to the Tuthill home, she received no answer.

The day after Robert was born, Keady attended a meeting with staff from both the mental-health center and the medical facility where Terri gave birth to discuss the situation. Keady stated her understanding that, given Robert's Native American heritage, she had to refer him to the BIA for child welfare and assessment services before any action could be taken by SRS. It was decided that the Tuthills should keep the baby and be given intensive support services. Keady

contacted the BIA and arrangements were made for close supervision and frequent home visits by a social worker to help with parenting skills. Defendant Sramek concurred in Keady's handling of the case. Apart from an incident in which the social worker was unable on one occasion to reach the Tuthills (about which Keady was consulted), nothing eventful was related to SRS for a month and a half.

On a Friday in late September, Terri's case manager at the mental-health center informed SRS of a report of suspected child abuse based on Terri's claim that Booth had shaken the baby. Keady called the BIA but was unable to reach her contact person there. Early the next week, she arranged to meet the BIA social worker at the Tuthill home, but when she got there no one answered the door. Keady called Terri's case manager at the mental-health center, and her notes recount that, by then, the case manager thought that the baby was all right, that Booth appeared to treat him well, and that the shaking accusation may have all been in Terri's head. The case manager, however, denies telling Keady that she disbelieved what Terri said about Booth shaking the baby.

The next week, the case manager called to let Keady know that Terri had left the baby alone at home and refused to use a monitor, but that Booth had been contacted and came home from work to take care of him. Shortly thereafter, the case manager called to tell Keady that Terri had been sent to stay at a state

hospital for a couple of weeks and that Booth and a babysitter were providing care for the baby. Four days later, Robert was taken to the University of Kansas Medical Center where he was diagnosed with a skull fracture and shaken baby syndrome. Ultimately, Booth admitted to shaking the baby.

## II

In rejecting the § 1983 equal protection and § 1981 discrimination claims brought on behalf of Robert for lack of a triable issue of discriminatory animus, the district court noted:

> [T]here is no evidence in the record that defendants refused to offer or provide family services to [Robert] *because of* an intent to discriminate. Instead, the evidence indicates that defendants thought, perhaps mistakenly, that the BIA, rather than SRS, was the proper agency to provide family services and, in fact, social workers from the Seneca Cayuga Tribe provided family services such as visits to the Tuthill home. . . . Defendants' failure to provide family services may be considered, at most, negligent, but there is no evidence from which this court can infer that defendants acted with racial animus.

District Court Order at 12–13 (rejecting § 1983 claim); see id. at 14–15 (rejecting § 1981 claim). On appeal, the Roes advance two arguments: (1) the district court applied an improper standard of proof by rejecting the discrimination claims solely for lack of evidence showing similarly-situated but differently-treated SRS clients; and (2) the evidence created a triable issue of actionable discrimination against Robert. In so arguing, the Roes misread the district court's rationale. As the quoted passage reflects, the court did not peremptorily invoke a categorical

evidentiary rule; rather, in enforcing the essential legal requirement of an <u>intent</u> to <u>discriminate</u>, the court discerningly invoked two interlinked principles that reveal a fatal substantive deficiency in the plaintiff's evidentiary showing.

The first focuses on the requirement of <u>intentional</u> conduct. It is hornbook constitutional law that mere negligence or mistake resulting in uneven application of the law is not an equal protection violation. <u>See</u> <u>Sylvia Dev. Corp. v. Calvert County</u>, 48 F.3d 810, 825 (4 th Cir. 1995) (following <u>Snowden v. Hughes</u>, 321 U.S. 1, 8, 11–12 (1944)); <u>Rickett v. Jones</u>, 901 F.2d 1058, 1060–61 (11 th Cir. 1990) ("The Supreme Court has repeatedly rejected the contention that inequality due to error violates equal protection."); <u>Shango v. Jurich</u>, 681 F.2d 1091, 1104 (7th Cir. 1982). Thus, insofar as this case rests on defendants' misjudgment of the danger faced by Robert, or their alleged error in concluding that they had to defer to the BIA in assessing and responding to that danger, the district court properly held no equal protection or discrimination claim was implicated.

There may be some degree to which intentional conduct is involved here—because of Robert's ancestry and defendants' understanding of its legal impact on their duty to provide social services, defendants deliberately yielded direct responsibility for Robert's welfare to the BIA. This brings into play the second principle alluded to above. To be actionable, defendants' conduct must have been imbued with or directed toward an impermissible <u>discriminatory</u>

purpose,[2] which "implies more than intent as violation or intent as awareness of consequences. It implies that a decisionmaker singled out [the plaintiff] for disparate treatment and selected [t]his course of action at least in part *for the purpose of causing its adverse effects*." Nabozny v. Podlesny, 92 F.3d 446, 454 (7th Cir. 1996) (quotation omitted and emphasis added); see Weixel v. Bd. of Educ., 287 F.3d 138, 151 (2d Cir. 2002) (holding class-based discrimination claim requires intent to disadvantage plaintiff class); Edwards v. Johnson, 209 F.3d 772, 780 (5 th Cir. 2000) (holding class-based disparate treatment actionable if done with "*purpose* of causing its adverse effect on [plaintiff] group" (quotation omitted)). On its face, defendants' conduct reflects a persistent effort to monitor the welfare of the newborn baby while adhering to a federal directive thought to require deference to BIA handling of Native American family matters—neither of which evinces or suggests any intention to disadvantage the plaintiff.

We do not mean to imply that a malicious intent to inflict harm is required, as the Supreme Court disclaimed in Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 269–70 (1993). Endeavoring to state a standard which required something less than deliberate injury but something more than naked

---

[2] Such purposeful discrimination is a critical element for the claims asserted under both § 1981 and § 1983. See Gant ex rel. Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 139–40 (2d Cir. 1999); Mustafa v. Clark County Sch. Dist., 157 F.3d 1169, 1180 (9 th Cir. 1998).

"volition"—in particular, a standard sensitive to the fact that "assertedly benign" motives are sometimes invoked to excuse what are in fact repressive measures directed at (and based on pernicious stereotypes of) particular groups, such as paternalistic restrictions to "protect" a "vulnerable" group by denying its members participation in activities others can freely choose to engage in—the Bray Court used the phrase "objectively invidious discrimination" to capture the requisite intent. Id. at 269–71; see also Nat'l Comm. of the Reform Party of the United States v. Democratic Nat'l Comm., 168 F.3d 360, 366 (9 th Cir. 1999). The Court went on to cite with approval the definition of "invidious" as "tending to excite odium, ill will, or envy, likely to give offense; esp., unjustly and irritatingly discriminating." Bray, 506 U.S. at 274 (quotation omitted); see Richland Bookmart, Inc. v. Nichols, 278 F.3d 570, 577 (6 th Cir.), cert. denied, 123 S. Ct. 109 (2002). In this regard, it is significant that the pertinent classification here implicates the historically-acknowledged and constitutionally-sanctioned accommodation by Congress to the unique sovereign identity of the Native American Tribes, [3] not an insulting or invidious stereotype. Moreover, the action

---

[3] As the Supreme Court explained while approving (benevolent) differential treatment of Native Americans in the employment context:

Literally every piece of legislation dealing with Indian tribes and reservations, and certainly all legislation dealing with the BIA, single out for special treatment a constituency of tribal Indians living on or

(continued...)

-8-

taken based on that classification involved deference to a culturally preferred service provider, not a denial of services. There is nothing in such deference to suggest it derives from inherently invidious discrimination.

In sum, "[w]hether one agrees or disagrees with [the promotion of Native American social services for Native Americans], that goal in itself . . . does not remotely qualify for such harsh description [as 'invidious'], and for such derogatory association with racism." Bray, 506 U.S. at 274. The Roes have not cited any contrary authority suggesting that the stated reason for defendants' conduct reflects invidious discrimination.

That is not the end of the matter, as the Roes also contend that the stated reason for defendants' conduct was not, in any event, the real reason. They insist that deference to the BIA was merely a pretext enabling defendants to evade their responsibility to provide social services based on Robert's Native American

---

[3](...continued)
near reservations. If these laws, derived from historical relationships and explicitly designed to help only Indians, were deemed invidious racial discrimination, an entire Title of the United States Code (25 U.S.C.) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized.

Morton v. Mancari, 417 U.S. 535, 553 (1974); see, e.g., Livingtson v. Ewing, 601 F.2d 1110, 1113 (10 th Cir. 1979); United States v. Decker, 600 F.2d 733, 740–41 (9 th Cir. 1979).

-9-

heritage. The district court held that the record was devoid of probative evidence to support this allegation, and we agree.

In repeated variations of the same argument, the Roes claim defendants' asserted (mis)understanding of the relevant legal directives is itself evidence of pretext. This is an unusual tack, in that it cites defendants' non-discriminatory explanation as evidence that this very explanation is a pretext for discrimination. While there may be circumstances in which such an explanation is so facially dubious that it provides affirmative evidence of pretext in this manner, nothing like that is presented here. Right or wrong, it was not, for example, implausible to deem reliance on Native American family services a proper means to monitor the situation and gather information relevant to (and contraindicative of) the need to pursue a preliminary inquiry regarding intervention under the state social-services scheme. It appears the approach alarmed no one at the time, and, indeed, was found appropriate by an expert witness who reviewed the record in this case.

We are referred to testimony from defendants' co-worker, Vinnie Harmon, a Native American who evidently filed an employment discrimination claim against defendant Sramek, which the Roes contend constitutes indirect evidence of a discriminatory animus operative in this case. Neither the details nor the resolution of the complaint are explained and, as defendants point out, our record does not contain materials relating to this complaint or transcripts of Harmon's

testimony. We will not speculate about potential inferences conceivably drawn from such vague, unsubstantiated, and collateral facts.

That brings us to what the Roes characterize as "the most damning direct evidence of intent to discriminate on the part of Wayne Sramek." (Appellant's Br. at 22.) In an interview with the Kansas Human Rights Commission, apparently in connection with Harmon's complaint, Keady related her perception of Sramek's attitude toward minorities: [4]

> Well, Wayne seemed to have it in for minorities. Blacks in particular I would say. We had this meeting as we had these job positions come open and he stated at that one meeting we got an Indian applying so we have to have a minority sitting in on the interview.

> I had a case where we had this Indian baby. I wanted to talk to Vinnie about it and because I wanted to get ahold of the address and telephone number for the bureau of indian affairs down there in Oklahoma. Now that's one thing Vinnie is up on. She's up on her indian stuff. My daughter-in-law is an indian. Well the thing that got me about this is that I know Vinnie keeps up on this stuff and I went to Wayne (Sramek) and told him about how I was going to go to Vinnie to ask about this indian baby and he said to leave Vinnie alone that he would make a call and get the address and telephone number himself. Well you know, like I said, it's something I don't understand because Vinnie keeps up on this and if he didn't know she would have probably been the easiest person to have gotten the information from.

---

[4] The Roes failed to include this statement in the appellate record, though the district court clearly reviewed it. The quotation above is from the "Additional Statements of Uncontroverted Fact" included in a response to defendants' motion for summary judgment. We do not condone reliance on such derivative sources; however, under the circumstances, we consider the statement and conclude that it would not, in any event, affect our disposition of the appeal.

-11-

I don't know he just said different things that you didn't quite know
how to take.

(Appellant's App. at 269.)  The district court observed that this statement was evidenced solely by an undated and unsigned loose typed sheet (marked "page 3"), and rejected it for non-compliance with evidentiary procedure.  Discretionary authority over the admission or exclusion of evidence on summary judgment lies with the district court, Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc., 131 F.3d 874, 894 (10 th Cir. 1997), and that discretion was not abused here.  In any event, as the district court noted, discriminatory intent cannot be inferred simply because Sramek declined to call another SRS worker to get the address and phone number of the BIA in Oklahoma.

Finally, we return to the Roes' argument that the district court applied an unduly rigid standard of proof in dismissing the plaintiff's claims for lack of evidence of similarly-situated but differently-treated SRS clients.  Questions of whether or when such proof may be a necessary condition for establishing a cause of action for discrimination are certainly important in the abstract, but are simply not pertinent in the context of the present appeal.  The district court clearly gave consideration to alternative means of proof; notably, the "foremost" reason cited for granting summary judgment was not the absence of specific comparisons to other SRS clients, but the failure of any other means of direct or circumstantial proof to demonstrate the required invidiously discriminatory intent.

-12-

As we have discussed at some length, we agree with that assessment. Thus, we need not and do not address the abstract legal issue regarding the role of comparative proof that the Roes inaptly characterize as dispositive of this appeal.

### III

The judgment is **AFFIRMED**.