FILED
United States Court of Appeals
Tenth Circuit

August 28, 2020

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

DAMEA SHANDALE TENISON,

    Plaintiff - Appellant,

v.

RAYMOND BYRD, individually and as
head Warden in his official capacity;
SYBIL MCGHEE, individually and as
Correctional Counselor in her official
capacity; MICHAEL WHITE, individually
and as Chaplain in his official capacity;
ARTHUR FOX, individually and as
Chaplain in his official capacity;
CHARLES PAINE, individually and in his
official capacity,

    Defendants - Appellees.

No. 19-6016
(D.C. No. 5:17-CV-01265-C)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **EID**, **KELLY**, and **CARSON**, Circuit Judges.
_____

    Damea Shandale Tenison, an Oklahoma prisoner proceeding pro se, sued five

officials at the Cimarron Correctional Facility (CCF), asserting claims under 42 U.S.C.

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

§ 1983 and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc to 2000cc-5. Tenison appeals from the district court's dismissal of certain claims and its grant of summary judgment in favor of the defendants on others. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand for further proceedings.

## BACKGROUND

Tenison is a Muslim incarcerated at the CCF, a private prison that contracts with the Oklahoma Department of Corrections (ODOC) to house Oklahoma prisoners. He sued the CCF employees in their individual and official capacities, seeking monetary, injunctive, and declaratory relief. His claims were based on three distinct sets of factual allegations. First, Tenison claimed Warden Raymond Byrd, Correctional Counselor Sybil McGhee, Chaplain Arthur Fox, and Chaplain Michael White (1) violated his First Amendment right to freely exercise his religion and RLUIPA by prohibiting him from praying in his housing unit's common space (the dayroom), instead requiring him to pray only in his cell, and (2) violated his Fourteenth Amendment right to equal protection by allowing Christians to practice their religion in the dayroom while prohibiting him from exercising his religion there. Second, he claimed that these same defendants violated his First Amendment right to freely exercise his religion by temporarily suspending him from the CCF's religious diet program for allegedly violating the prison's religious diet agreement. And third, he asserted that CCF physician Charles Paine and Byrd were deliberately indifferent to a serious medical need, in violation of the Eighth Amendment.

2

Both sides moved for summary judgment and submitted affidavits and other evidence in support of their arguments.

On referral from the district court, the magistrate judge first screened Tenison's complaint pursuant to 28 U.S.C. §§ 1915A and 1915(e)(2) and recommended that the court dismiss a number of Tenison's individual- and official-capacity claims for failure to state a claim. The magistrate judge then recommended that the district court grant the defendants' motion for summary judgment on Tenison's remaining claims and deny Tenison's summary judgment motion as moot. The district court adopted the magistrate judge's report and recommendation over Tenison's timely objections and entered judgment against him. This appeal followed.[1]

## DISCUSSION

### I. Claims Dismissed on Screening

Regarding the claims dismissed on screening, Tenison's opening brief challenges only the district court's dismissal of his constitutional claims seeking monetary damages from the defendants in their official capacities.[2] The district court dismissed those claims without prejudice on the ground that Eleventh Amendment

---

[1] Because Tenison proceeds pro se, we construe his filings liberally, but we do not act as his advocate. *See Yang v. Archuleta*, 525 F.3d 925, 927 n.1 (10th Cir. 2008).

[2] The district court also dismissed with prejudice: (1) Tenison's First Amendment and equal protection claims seeking injunctive relief against the defendants in their individual capacities, (2) his RLUIPA claim for monetary damages, and (3) his RLUIPA claim against the defendants in their individual capacities. Tenison offers no reasoned argument disputing the district court's rationale for dismissing these claims and therefore has forfeited appellate review of their dismissal. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007).

3

immunity bars monetary claims against the State of Oklahoma or its officials sued in their official capacities in federal court. *See* 28 U.S.C. § 1915A(b)(2) (authorizing the district court to dismiss a claim that "seeks monetary relief from a defendant who is immune from such relief"); *id.* § 1915(e)(2)(B)(iii) (same). We review a determination of Eleventh Amendment immunity de novo. *Arbogast v. Kan., Dep't of Labor*, 789 F.3d 1174, 1181 (10th Cir. 2015).

Tenison contends the district court erred because the defendants, as employees of a private prison, are not entitled to immunity. *Cf. Richardson v. McKnight,* 521 U.S. 399, 412 (1997) ("[P]rivate prison guards, unlike those who work directly for the government, do not enjoy [qualified] immunity from suit in a § 1983 case."). He is correct—the district court misapprehended the defendants' status. They are not employees of the state, but of CoreCivic, Inc., a private corporation. And Eleventh Amendment immunity does not extend to private corporations. *See Del Campo v. Kennedy*, 517 F.3d 1070, 1074, 1080-81 (9th Cir. 2008). Accordingly, the district court erred in applying Eleventh Amendment immunity.

But the error is harmless. For the same reason the defendants do not enjoy the protection of Eleventh Amendment immunity—that they are not employees of the State—they do not possess an "official capacity" in which to be sued. Therefore, the claims still were subject to dismissal, although for failure to state a claim rather than immunity. *See* 28 U.S.C. § 1915A(b)(1) (authorizing the district court to dismiss a claim that "fails to state a claim upon which relief may be granted"); *id.* § 1915(e)(2)(B)(ii) (same).

4

## II. Claims Decided on Summary Judgment

Tenison challenges the district court's grant of summary judgment on his remaining claims. "[W]e review summary judgment decisions de novo, applying the same legal standard as the district court." *Talley v. Time, Inc.*, 923 F.3d 878, 893 (10th Cir. 2019) (internal quotation marks omitted). Under this standard, summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]e view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Talley*, 923 F.3d at 893 (internal quotation marks omitted). In this regard, "[i]t is axiomatic that a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment." *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000).

### A. Dayroom Claims

The dayroom is a common area available to the 120 prisoners housed in Tenison's unit, Bravo South. During the day, inmates can choose to remain inside their assigned cells or to be outside their cells in the dayroom. Because cell doors are kept locked for security purposes, a CCF staff member is supposed to let inmates in and out of their cells during the day, generally on the hour and half-hour. The defendants presented evidence that CCF seeks to maintain the dayroom as a "neutral zone" for all inmates in the unit, R. Vol. II at 267, and inmate activities there include playing cards or games, watching television, exercising, visiting with each other,

preparing meals, and eating.  Because the dayroom is a neutral space, the defendants

maintain that religious activities are not permitted there.

Tenison uses a prayer rug to pray five times a day on an established schedule,

with the exact times varying during the year.  Until February 2017, Tenison prayed in

the dayroom.  But then he was told that prayer was not allowed in the dayroom, and

he must conduct all his prayers in his cell.  Tenison challenges the ban on Muslim

prayer in the dayroom under the Fourteenth Amendment's Equal Protection Clause,

RLUIPA, and the First Amendment's Free Exercise Clause.

### 1.      Fourteenth Amendment Equal Protection Claim

"The Equal Protection Clause of the Fourteenth Amendment commands that no

State shall deny to any person within its jurisdiction the equal protection of the laws,

which is essentially a direction that all persons similarly situated should be treated

alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (internal

quotation marks omitted).  "In order to assert a viable equal protection claim,

plaintiffs must first make a threshold showing that they were treated differently from

others who were similarly situated to them."  *Barney v. Pulsipher*, 143 F.3d 1299,

1312 (10th Cir. 1998).

Tenison asserts that Byrd, McGhee, Fox, and White violated his right to equal

protection by allowing Christian prisoners in Bravo South to pray in the dayroom but

prohibiting him and other Muslim prisoners from doing so.  The district court held

that Tenison had not offered evidence that the defendants had purposefully

discriminated against Muslims.  *See Lewis v. City of Ft. Collins*, 903 F.2d 752, 755

6

n.1 (10th Cir. 1990) (stating that "purposeful discrimination is an essential element of an equal protection violation"). The only evidence the district court considered, however, related to White holding communion for Christian inmates in the Bravo South dayroom in April 2017, weeks after Tenison had been barred from praying there. The district court concluded, based on the defendants' proffered affidavits, that White's actions were isolated and the result of negligence, not discriminatory intent. *See Roe ex rel. Roe v. Keady*, 329 F.3d 1188, 1191-92 (10th Cir. 2003) ("It is hornbook constitutional law that mere negligence or mistake resulting in uneven application of the law is not an equal protection violation."). The district court, however, did not view the evidence in the light most favorable to Tenison, and its analysis did not take account of all of Tenison's evidence of disparate treatment.

The district court accepted the defendants' averments that White mistakenly held communion in the dayroom, failing to realize that the service was not allowed. Tenison, however, identified White as one of the prison officials who had told him, before White held the communion services, that praying was no longer allowed on the unit. Moreover, Tenison presented evidence that White held communion in Bravo South common areas three times over a three-week period in April 2017, and that one of those times was after he specifically had been told not to perform religious ceremonies in a common area. Construed in the light most favorable to Tenison, this evidence could lead a reasonable juror to disbelieve the defendants' assertion that White acted inadvertently.

7

Moreover, Tenison presented additional evidence of differential treatment of Christians and Muslims with regard to prayer in the dayroom. Tenison's verified motion for summary judgment stated, under penalty of perjury, that "[e]very day on housing unit Bravo South on the day room floor, my fellow prisoners have some kind of prayer." R. Vol. II at 23. He specifically identified three instances of Christian prayer in the dayroom on May 1 and 2, 2018, and another instance in June 2018, but asserted "[t]his happened every day." *Id.* And his allegations were supported by an affidavit from another inmate. A Christian also living on Bravo South stated that he had "prayed on the unit floor . . . without any officer saying anything to [him] or [his] Christian brothers." *Id.* at 48.

In addition, while Assistant Warden Virgil Ensey stated in his affidavit that "[t]he Dayroom is not designed to have people engaging in specific religious activities, either individually or together. . . . The Dayroom is intended to be a neutral zone for all inmates," *id.* at 141, he then acknowledged that "[n]o inmate, to include Mr. Tenison, has been asked to refrain from bowing their heads and engaging in silent prayer while in the Dayroom," *id.* at 142. Construed in the light most favorable to Tenison, this is an admission that prison officials knowingly allow a type of prayer practiced by Christians (though not typically by Muslims) in the Bravo South dayroom.

If believed, Tenison's evidence is sufficient for a reasonable factfinder to conclude that Christians seeking to practice their religion in the dayroom deliberately are treated differently (and more favorably) than Muslims. Therefore, we reverse the

grant of summary judgment on Tenison's equal protection claim and remand for further proceedings.

## 2. RLUIPA Claim

To proceed with a RLUIPA claim, a plaintiff must demonstrate that "he wishes to engage in (1) a religious exercise (2) motivated by a sincerely held belief, which exercise (3) is subject to a substantial burden imposed by the government." *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1312 (10th Cir. 2010). Once the plaintiff shows a substantial burden, the government must demonstrate that the burden "results from a compelling governmental interest and that the government has employed the least restrictive means of accomplishing its interest." *Id.* at 1318 (internal quotation marks omitted); *see also* 42 U.S.C. § 2000cc-1(a).

No one disputes that Tenison's prayers are a religious exercise or that his beliefs about his prayers are sincere. Instead, the district court decided the RLUIPA claim on the "substantial burden" prong, concluding that Tenison had failed to establish that requiring him to pray in his cell substantially burdened his religious exercise. We agree.

At a minimum, a government substantially burdens a religious exercise when it (1) "requires participation in an activity prohibited by a sincerely held religious belief," (2) "prevents participation in conduct motivated by a sincerely held religious belief," or (3) "places substantial pressure on an adherent either not to engage in conduct motivated by a sincerely held religious belief or to engage in conduct

9

contrary to a sincerely held religious belief." *Abdulhaseeb*, 600 F.3d at 1315. The second and third means are relevant here.[3]

Tenison asserts that Muslim prayer times vary throughout the year and depend on the adherent's location. He believes he must pray at exactly the prescribed time, or the prayers are useless. He asserts that combined with his work and sleep schedule, the requirement that he pray only in his cell leaves him little to no time to use the dayroom because the cell doors are kept locked, and correctional officers must let him in and out of his cell. The defendants state that correctional officers make rounds every 30 minutes. Tenison, however, submitted evidence that the rounds are not regular and, instead of every 30 minutes, they may occur every 45 minutes or every hour. Tenison asserts that the irregular nature of the officers' rounds could make him late for prayer and means that he spends more time in his cell than he would otherwise, for fear of missing the proper prayer time. He argues that his evidence is sufficient to show (1) he is prevented from praying, and/or (2) he is subjected to substantial pressure not to pray because he is forced to choose between using the dayroom and remaining in his cell to conduct his prayers.

We are not persuaded, however, that requiring Tenison to return to his cell to pray either prevents him from praying or subjects him to substantial pressure not to pray. Tenison is not prevented from praying; he simply must plan his dayroom time

---

[3] Tenison asserts that he is required to participate in an activity prohibited by his religion by bowing his head in Christian prayer in the dayroom. We agree with the district court that there is no evidence that Tenison is forced to bow his head, as distinguished from being allowed to do so.

10

around the times he must be in his cell to pray. And having to forgo an unspecified amount of dayroom time does not amount to substantial pressure not to return to his cell to pray. Although Tenison disputes the defendants' position that the officers make rounds every 30 minutes, the record indicates that they make rounds on at least an hourly basis. In a similar case, the Fifth Circuit held that a Muslim prisoner who was not allowed to pray in the dayroom had failed to establish a substantial burden because he had "hourly access" to the recreation yard and his cell, where he could pray. *DeMoss v. Crain*, 636 F.3d 145, 153 (5th Cir. 2011) (per curiam). The court concluded:

> DeMoss is not faced with a choice between timely saying his prayers and violating [prison] policy, but rather must choose between using the dayroom during certain hours and praying. Although the dayroom policy burdens DeMoss by requiring him to anticipate when he must leave the dayroom to pray, this burden is not substantial because it does not pressure him to significantly modify his religious behavior . . . .

*Id.*

Because Tenison has failed to establish the ban on Muslim prayer in the dayroom substantially burdens his religious exercise, we affirm the grant of summary judgment on the RLUIPA claim.

### 3. First Amendment Claim

"[I]n order to allege a constitutional violation based on a free exercise claim, a prisoner-plaintiff . . . must first show that a prison regulation substantially burdened sincerely-held religious beliefs." *Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007) (ellipsis and internal quotation marks omitted). The third part of the test for

11

substantial burden under RLUIPA and the test for substantial burden under the First Amendment are similar. *See Abdulhaseeb*, 600 F.3d at 1315. Having concluded that Tenison failed to show a substantial burden under the third part of the RLUIPA test, we further conclude that his First Amendment claim fails for the same reason.

Even if Tenison had shown a substantial burden, however, we would affirm the district court's determination that the First Amendment claim does not survive analysis under *Turner v. Safley*, 482 U.S. 78, 89-90 (1987). Under *Turner*, "restrictive prison regulations are permissible if they are reasonably related to legitimate penological interests, and are not an exaggerated response to such objectives," *Beard v. Banks*, 548 U.S. 521, 528 (2006) (citation and internal quotation marks omitted) (plurality opinion). *Turner* set forth four factors for courts to consider in assessing reasonableness:

> First, is there a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it? Second, are there alternative means of exercising the right that remain open to prison inmates? Third, what impact will accommodation of the asserted constitutional right have on guards and other inmates, and on the allocation of prison resources generally? And, fourth, are ready alternatives for furthering the governmental interest available?

*Wardell v. Duncan*, 470 F.3d 954, 960 (10th Cir. 2006) (internal quotation marks omitted). "*Turner* thus requires courts, on a case-by-case basis, to look closely at the facts of a particular case and the specific regulations and interests of the prison system in determining whether prisoners' constitutional rights may be curtailed." *Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002).

12

Once the prisoner has established a substantial burden, the "prison officials-defendants may identify the legitimate penological interests that justif[y] the impinging conduct." *Kay*, 500 F.3d at 1218 (brackets and internal quotation marks omitted). The defendants assert that they implemented the dayroom prayer ban because of security concerns. "Mr. Tenison's, and other inmates' desire to have religious observances and practices in the dayroom, would cause congestion and obstructions and create impediments to the on-duty correctional officer being able to circulate around the dayroom to maintain order and discipline." Aplee. Resp. Br. at 7-8. The defendants further state that officers would have to inspect Tenison's prayer rug each time he exited or entered his cell, which "would distract the correctional officer from his assigned duties in observing other inmates and their activities." *Id.* at 8.

After the prisoner has established a substantial burden and the prison officials identify legitimate penological interests, the court balances the *Turner* factors. *See Kay*, 500 F.3d at 1218-19. The first factor is whether there is a "valid, rational connection" between the regulation and the asserted penological interest. *Turner*, 482 U.S. at 89. It is beyond question that security interests are a legitimate penological concern. *See id.* at 86; *Hammons v. Saffle*, 348 F.3d 1250, 1254-55 (10th Cir. 2003). And this factor is satisfied by "a minimal showing" by prison administration of a rational relationship between the policy and asserted goals. *Beerheide*, 286 F.3d at 1186. The defendants have established that "minimal showing" in this case, as there is a connection between the security interest in

13

monitoring the dayroom and banning prostrate prayer, which could visually and physically obstruct the correctional officers monitoring the dayroom.

The second factor is "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. As the district court concluded, Tenison retains the ability to perform his prayers in his cell. As discussed above, that may not be an ideal alternative, but nonetheless, it is an alternative. "This court has held that an alternative means exists so long as *some* means, albeit not plaintiff's preferred means, of religious exercise is available." *Hammons*, 348 F.3d at 1256; *see also Wardell*, 470 F.3d at 961 (stating that the "alternatives need not be ideal[;] they need only be available" (internal quotation marks omitted)). And "[w]here other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation." *Turner*, 482 U.S. at 90 (citation, ellipsis, and internal quotation marks omitted).

The third factor examines the impact accommodating the prisoner "will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* "When accommodation of an asserted right will have a significant ripple effect on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.* (internal quotation marks omitted). The defendants again cite security concerns in overseeing the dayroom and inspecting Tenison's prayer rug. This factor weighs in favor of the defendants, as allowing Tenison to pray in the dayroom would necessarily involve the attention of

14

correctional officers, and any resources allocated to oversee Tenison's prayers would be unavailable for other purposes. *See Hammons*, 348 F.3d at 1257.

Finally, the fourth factor is "the absence of ready alternatives." *Turner*, 482 U.S. at 90. "[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91. Tenison suggested that he be allowed to use an unused office space in the unit. The defendants did not reply to his suggestion, but the district court concluded that this alternative did not present *de minimis* cost to the defendants' legitimate interest "as it would require extra prison staff to monitor the office and allow prisoners in and out for prayer all day." R. Vol. II at 393. We agree with the district court that the record does not establish that the unused office space presents an "obvious, easy alternative[]" that could be implemented at "*de minimis* cost" to the defendants' security concerns. *Turner*, 482 U.S. at 90-91.

For these reasons, we affirm the district court's determination that the ban on Muslim prayer in the dayroom is not a violation of Tenison's First Amendment right to freely exercise his religion.

## B. Religious Diet Claim

Prisoners have a First Amendment right to a diet that conforms to their religious beliefs. *Beerheide*, 286 F.3d at 1185. Tenison has received a halal diet at CCF since at

least 2015.  One of his First Amendment claims arises out of a temporary suspension from the religious diet program in February 2017.

Tenison was required to sign a religious diet contract to receive halal meals.  That contract prohibits inmates from "barter[ing] prepackaged kosher or halal meals."  R. Vol. II at 280.  McGhee e-mailed Fox that she had seen Tenison give away his halal tray and suspected he had done so as payment for having his clothes ironed.  Fox then suspended the halal diet for 120 days because Tenison had "giv[en] away [his] Halal tray . . . [in] violation of the Halal diet contract."  *Id.* at 279 (underline omitted).  But ODOC does not prohibit inmates from giving away their religious diet meals.  Upon consulting with the ODOC's chaplain after Tenison protested the suspension, Fox discovered that Tenison had committed no violation.  As a result, Fox lifted the suspension and reinstated Tenison's halal diet.  The suspension lasted approximately five to seven days.

The district court reviewed the prison's anti-bartering policy under the *Turner* factors and held that it was reasonably related to legitimate penological interests.  But given that the record shows that Tenison did not violate the anti-bartering policy, the constitutionality of the policy is not at issue.  Instead of further considering the policy, we affirm on another ground.  *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011) (recognizing "we may affirm on any basis supported by the record").

Tenison emphasizes that Fox was mistaken in believing that Tenison had violated the religious diet agreement, but he does not challenge the magistrate judge's finding that Fox suspended Tenison "based on a reasonable belief" that a violation had occurred. R. Vol. II at 383.  Further, he does not dispute that Fox quickly took steps to correct his

16

mistake when he learned that Tenison had not violated the diet agreement. We have held that "an isolated act of negligence would not violate an inmate's First Amendment right to free exercise of religion." *Gallagher v. Shelton*, 587 F.3d 1063, 1070 (10th Cir. 2009); *see also Colvin v. Caruso*, 605 F.3d 282, 293 (6th Cir. 2010) (affirming grant of summary judgment on free-exercise claim because "mistakes" in serving plaintiff non-kosher foods were "isolated incidents," there was no evidence that defendants intentionally served him non-kosher items, and prison staff worked to correct their errors (internal quotation marks omitted)). Fox's temporary suspension of the religious diet, resulting from his mistaken belief that Tenison had violated the religious diet agreement, is at most an isolated act of negligence that does not support a constitutional claim. We therefore affirm the grant of summary judgment to the defendants on this claim.

## C.  Eighth Amendment Claim

Tenison claims that Byrd and Paine exhibited deliberate indifference to his serious medical need, in violation of the Eighth Amendment. The claim arises from Tenison's inability to ejaculate after having hemorrhoid surgery in 2015. At an exam in May 2016, Tenison asked Paine for a referral to an outside specialist because this condition had not resolved within a year of surgery as had been expected. Paine initially refused this request based on Tenison's report that his condition was not interfering with his activities of daily living and because fertility concerns were not an issue given Tenison's life sentence. But by December 2016, after additional requests and grievances from Tenison, Paine agreed to request a referral and Tenison ultimately saw an outside specialist in October 2017. The specialist referred Tenison

17

to the University of Oklahoma's (OU) urology department for further evaluation and treatment. Paine requested the appointment for Tenison, and it was initially scheduled for February 2018. Since then the OU Medical Center has cancelled and then rescheduled Tenison's appointment three times. Tenison represents in his briefs that he has not yet seen the OU specialist and there is no evidence in the record that he has done so.

To proceed with an Eighth Amendment claim regarding the denial of medical treatment, Tenison must make two showings, one objective and one subjective. *Requena v. Roberts*, 893 F.3d 1195, 1215 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 800 (2019). "First, he must produce objective evidence that the deprivation at issue was in fact sufficiently serious" to implicate the Eighth Amendment. *Id.* (internal quotation marks omitted); *see Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). Second, under the subjective component, Tenison must "present evidence of the prison official's culpable state of mind," *Mata*, 427 F.3d at 751, which requires a showing that the official knew the inmate "faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it," *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009) (internal quotation marks omitted); *see also Mata*, 427 F.3d at 751. The district court concluded that Tenison failed to satisfy either component. We agree.

"[A] delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm." *Requena*, 893 F.3d at 1216 (internal quotation marks omitted). "The substantial harm

18

requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Id.* (brackets and internal quotation marks omitted). Tenison did not argue or present evidence that the delay in treating his inability to ejaculate negatively affects his health, impairs his activities of daily living, or otherwise causes him harm, let alone substantial harm. He thus has not established the objective component.

As for the subjective component, Tenison did not present evidence that Byrd and Paine failed to take reasonable measures to abate a substantial risk of harm to him. As just described, he failed to establish the delay in treating his condition causes him harm, let alone a substantial risk of harm. Moreover, he failed to establish that these defendants failed to take reasonable measures to treat his condition. The undisputed record shows that Paine met with Tenison regarding this condition four times between May 2016 and June 2017, that he agreed to refer him to an outside specialist in December 2016, that he responded to the specialist's pre-appointment requests for Tenison's surgical records, and followed up on the specialist's recommendation by scheduling an appointment for Tenison with OU's urology department. While it does not appear that Tenison has yet had this second appointment, the record indicates the delay was caused by OU Medical cancelling and rescheduling the appointment, rather than some action or inaction by Paine and Byrd. Accordingly, Tenison has failed to establish the subjective prong.

For these reasons, the district court appropriately granted summary judgment to Paine and Byrd on the Eighth Amendment claim.

## CONCLUSION

Tenison's motion to proceed without prepayment of fees and costs and his motion to amend his reply brief are granted. We remind him of his obligation to continue making partial payments until the entire appellate filing fee is paid. The grant of summary judgment on the Fourteenth Amendment dayroom claim is reversed and remanded for further proceedings. The remainder of the district court's judgment is affirmed.

Entered for the Court

Joel M. Carson III
Circuit Judge

20